T.C. Memo. 1995-512

UNITED STATES TAX COURT

HENRY DELETIS, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8917-93.            Filed October 26, 1995.

Henry Deletis, Jr., pro se.

<u>Amy Dyar Seals</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARKER, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income tax and additions to tax for fraud as follows:

| Year | Deficiency | Additions to Tax Sec. 6653(b) |
|------|------------|-------------------------------|
| 1966 | $14,374.82 | $8,113.44 |
| 1967 | 108,045.72 | 54,022.86 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues for decision are:

1. Whether petitioner had unreported income in the amounts of $37,636.73 and $148,518.66 from the sale of stolen cars in the taxable years 1966 and 1967, respectively;

2. whether petitioner had unreported dividend income of $15,922.84 from Bud-N-Jan Stables, Inc. in taxable year 1967; and

3. whether petitioner is liable for the addition to tax for fraud under section 6653(b) for each year.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts, Supplemental Stipulation of Facts, and the exhibits attached thereto are incorporated herein by this reference.

Henry Deletis, Jr. (petitioner) resided in Fayetteville, North Carolina, at the time he filed his petition in this case.

### Stolen Car Sales

Petitioner worked for Herbert J. Caplan, Inc., a Buick dealership (the dealership), in Brooklyn, New York, for 14 years;

---

[1] Petitioner has conceded interest income of $5.73 and $3.15 for the 1966 and 1967 taxable years, respectively, and wage income of $12,324.95 for 1967. Respondent has conceded $10 of the income from the stolen cars for taxable year 1967, so that the claimed amount is $148,518.66 rather than $148,528.66.

he was the used car sales manager.  Petitioner was a trusted
employee, and he had a close personal relationship with the
dealership owner, Herbert Caplan (Caplan), in the nature of a
father-and-son relationship.  Petitioner and Caplan went to the
race track together and gambled on the horses.

During 1966 and 1967, petitioner sold some of the
dealership's new and used cars, pocketed the proceeds, and did
not repay the dealership for the cars.  Petitioner deposited
substantial amounts of these proceeds into his personal bank
account at Bankers Trust Company.  Deposits to petitioner's
account during 1966 exceeded $117,000; during 1967, the deposits
amounted to nearly $278,000.  Petitioner's wages from the
dealership were $15,886.10 in 1966 and $12,324.95 in 1967.
Records of the dealership reflected the sales of certain new cars
to individual owners, complete with deposits and financing
through Bankers Trust Company; the dates of those sales fell in
1966 and 1967.  However, those purchasers proved to be
fictitious.  In actuality, petitioner had sold these new cars to
used car dealers.

In 1966, petitioner received $42,050 from the sale of 11 new
cars; he also sold three additional new cars the selling prices
of which are unknown but the invoice prices of which totaled
$13,911.  In 1967, petitioner received $89,200 from the sale of
23 new cars.  Petitioner made payments to the bank on the loans

obtained for these new cars.  These loan payments totaled $4,448.85 in 1966 and $32,099.38 in 1967.

Petitioner also sold some of the dealership's used cars directly to used car dealers, without fictitious intermediate buyers.  During 1967, petitioner sold 38 used cars to dealers Herman Weisberger (Weisberger) and Morton Best (Best) for which he received $59,830.  Petitioner sold an additional 23 used cars, whose value totaled $55,525, to other dealers during 1967.

In November of 1967, Caplan consulted with the Buick Regional Office concerning the dealership's cash flow problem; the amount of cash was not commensurate with the volume of business that was apparently being done.  Thereafter, the dealership conducted a physical inventory of its cars. Petitioner assisted by providing a list of those used cars that he had sold without remitting the proceeds to the dealership. Caplan discharged petitioner on or before December 1, 1967. Petitioner, Weisberger, and Best offered to make restitution to the dealership for the stolen proceeds.  On December 8, 1967, Caplan sent a letter prepared by his attorney to the dealership's insurance company reporting the loss.  On December 11, 1967, Best provided Caplan with a list of 38 cars that Best had purchased from petitioner without receiving State of New York Department of Motor Vehicle Certificates of Sale (Forms MV-50).[2]  The

---

[2] Apparently, the seller is to issue the Form MV-50 to the purchaser in order for the purchaser to have title to the
(continued...)

dealership ultimately claimed and was allowed an embezzlement loss on its corporate income tax returns for 1966 and 1967.

Petitioner's Story

Petitioner stated that this scheme started in 1965. Petitioner admitted that it was his idea to "move a few cars", supposedly in order to help Caplan keep the dealership, but that the plan expanded to include many cars. Petitioner admits that "maybe I got a little greedy, and I took approximately $40,000 from that money". The dealership, according to petitioner, was experiencing financial difficulties resulting from the low volume of sales and the costs of purchasing a new location and building a showroom, after the previous landlord had refused to renew the lease. Petitioner said the downpayments on the new cars were actually monies transferred from the downpayments on used cars sales. Petitioner testified that it would have been impossible to maintain this scheme of "moving" cars, obtaining financing, transferring deposits, and making payments on the loans without someone in authority sanctioning these actions. Petitioner indicated that the dealership was holding checks for sales that they had noted on the books as paid.

According to petitioner, General Motors Acceptance Corporation (GMAC), a subsidiary of General Motors, conducted a review of the dealership approximately a year before the ultimate

---

[2](...continued)
vehicle, a prerequisite to the purchaser's legally reselling the car.

discovery of the misappropriation in late 1967.  Petitioner alleges that during this review, Caplan instructed him to cooperate with the auditors and show the auditors the checks they were holding.  Petitioner stated that several of these checks were from Weisberger and that petitioner was holding them until Weisberger could make good on them.  Petitioner said he explained the dealership's long-term relationship with Weisberger to the auditors and that nothing came of that review.

Petitioner insisted that he kept only $40,000 of the proceeds.  Petitioner asserted that it was the Buick Motor Division that initiated the late 1967 review, rather than Caplan asking for assistance.  Petitioner also stated that before this review occurred, he told Caplan about the $40,000 he took and about Weisberger's outstanding checks.  Petitioner did not explain where the rest of the proceeds went.  Petitioner never repaid Caplan for any of the money he took.  The record contains no evidence to corroborate petitioner's version of the events relating to the scheme.[3]

---

[3] Best testified that he could not recall any of the events about which petitioner questioned him.  Caplan is now deceased. Petitioner's testimony and post-trial briefs were largely efforts to blame everyone else.  However, his efforts at blame shifting failed to explain the deposits of large sums of money into his personal bank account or to explain what happened to that money. The Court did not find petitioner to be a credible witness, even as to events that were well documented.  For example, he insisted he only stole a little over $40,000 during 1966 and 1967 and insisted that he had pleaded guilty only to the theft of that amount.  However, count three to which he pleaded guilty was that he had received taxable income of $92,168.61 in 1967 as to which

(continued...)

## Bud-N-Jan Stables, Inc.

In late 1966, petitioner and his then wife, Janet Singer Deletis (Singer), organized Bud-N-Jan Stables, Inc. (the Stables) for the purpose of racing horses. Petitioner and Singer were the only two stockholders. Petitioner was president and treasurer of the Stables until December of 1967. The Stables had a bank account at Bankers Trust Company. The Stables owned about 12 horses worth almost $40,000 located in Maryland. The Stables used the services of three trainers: P.J. Johnson, Mario Padoranni, and Oliver Cutshaw. During 1967, the Stables raced its horses and won race purses totaling $39,304. The Stables did not file a Federal corporate income tax return for the taxable year 1967.

Petitioner invested some of the proceeds from the stolen car sales into the Stables. Petitioner contends that the only portion of the car sales proceeds that he kept was the $40,000 that he invested in the Stables. See supra note 3. Petitioner testified that he agreed to give the Stables to Caplan to pay off the money petitioner stole from the dealership, but that in December of 1967, Singer "stole" the Stables from him before he could do so. Petitioner signed an agreement whereby petitioner transferred his interest in the Stables to Singer in exchange for promissory notes; however, petitioner never received the notes.

---

[3](...continued)
he willfully and knowingly attempted to evade taxes.

Petitioner stated that when he went to Maryland to liquidate the Stables, he was unable to do so since the trainers had been instructed by Singer not to do business with him now that Singer was in control of the Stables.

The next day when petitioner returned to New York, petitioner found that Singer had changed the locks on their house. The following day, Singer moved everything out of the house, and petitioner did not know where she went. By the time petitioner located Singer, she had sold some of the horses. Petitioner sued to recover the Stables, but the court dismissed his action in 1968 or later. Petitioner divorced his wife at about that same time.

Petitioner's Criminal Indictments, Fugitive Status, and Pleas

On January 29, 1968, petitioner was arrested on a charge of grand larceny for stealing cars from the dealership. The Grand Jury of Kings County, New York, indicted petitioner and Weisberger on 13 counts of grand larceny first degree for the theft of the proceeds from the unauthorized sales of 13 of the dealership's new cars during 1967. On November 4, 1970, petitioner pleaded guilty to attempted grand larceny second degree. Petitioner failed to appear for sentencing on January 28, 1971, and a bench warrant was issued for his arrest. Petitioner was a fugitive from justice from 1971 until early 1987. Petitioner claimed he left town when another dealership

salesman told him that Caplan's alleged underworld friends were going to harm petitioner.

On March 22, 1973, petitioner was indicted on two counts of income tax evasion for the taxable years 1966 and 1967 and on one count of willfully making and subscribing to a false income tax return for the taxable year 1966. An arrest warrant was issued. After being a fugitive from justice for some 16 years, petitioner surfaced in early 1987. On July 31, 1987, petitioner pleaded guilty to one count of income tax evasion pursuant to section 7201 for the taxable year 1967. The count to which he pleaded guilty was that he had received taxable income of $92,168.61 in 1967 as to which he willfully and knowingly attempted to evade taxes.

Petitioner's Federal Income Tax Returns

Petitioner filed a joint Federal individual income tax return with Singer for the taxable year 1966. He reported his dealership wages of $15,886.10 and no other income. The signatures of both petitioner and Singer are dated April 17, 1967, but the envelope in which the return was mailed was postmarked May 18, 1967. No extension of time for filing was requested. Petitioner did not file a Federal individual income tax return for the taxable year 1967.

Respondent used the specific-items method to determine petitioner's unreported income from the car sales. Special Agent Nahmias of the Criminal Investigation Division of the Internal

Revenue Service (Nahmias) conducted an independent investigation.
Nahmias traced the stolen cars to the third-party used car
dealers who purchased them and determined the amounts paid to
petitioner for these cars.  He interviewed the dealers involved
and reviewed the canceled checks, the falsified new car invoices,
and the loan payments.  Nahmias allowed petitioner deductions of
$18,324.27 and $56,036.34 for 1966 and 1967, respectively, for
the deposits, loan payments, and insurance expenses on the stolen
cars.

For the taxable year 1966, respondent determined that
petitioner had failed to report $5.73 in interest income and
$37,636.73 in net income from the sale of the stolen cars,[4]
resulting in a deficiency in tax of $14,374.82.  Respondent also
determined an addition to tax for fraud under section 6653(b) in
the amount of $8,113.44.  Respondent issued the notice of
deficiency for taxable year 1966 on February 5, 1993.

Revenue Agent Metz (Metz) prepared a corporate return for
the Stables for the taxable year 1967.  Metz had none of the
Stables' business records, so he calculated income and expenses
through inquiries to third-party sources.  Metz used the American
Racing Manual Statistics to determine the amounts won by the

---

[4] The net income figure represents:

| | |
|---|---|
| Income from car sales | $42,050.00 |
| Income from car sales | 13,911.00 |
| Total income | $55,961.00 |
| Total expenses | - 18,324.27 |
| Net income | $37,636.73 |

Stables' horses ($39,304) and used this as the Stables' gross income. Petitioner agrees that the Stables had gross receipts of that amount in 1967. Metz estimated the Stables' expenses to total $23,281.16. These estimated expenses included sundries ($335.30), jockey fees ($2,483), insurance ($1,881.96), workmen's compensation ($174), fees for two trainers (P. J. Johnson, $1,313 and Mario Padoranni, $7,473.90), and loss on the sale of horses ($9,620). No fees were included for trainer Oliver Cutshaw. The sources for most of these estimates are unknown; no documentation of the expenses was presented at trial. Metz determined the names of the officers of the Stables from the bank account and insurance records. Not knowing who was in control of the Stables, Metz attributed the Stables' corporate income to both petitioner and Singer as dividend income.

There is no evidence of any payments by the Stables to, or on behalf of, petitioner.

For the taxable year 1967, respondent determined that petitioner had failed to report wage income of $12,324.95, dividend income from the Stables of $15,922.84 ($16,022.84 net income of Stables - $100 dividend exclusion), interest income of $3.15, and net income from the sale of stolen cars of $148,528.66,[5] resulting in a deficiency in tax of $108,045.72.

_____

[5] The net income figure represents:

| Income from car sales | $89,200.00 |
|---|---|
| Income from car sales | 59,830.00 |

(continued...)

Respondent determined an addition to tax for fraud under section 6653(b) in the amount of $54,022.86.  Respondent issued the notice of deficiency for taxable year 1967 on February 5, 1993.

OPINION

This is a fraud case in which respondent must prove fraud by clear and convincing evidence, and petitioner must prove any error in the deficiency determinations by a preponderance of the evidence.  Zack v. Commissioner, 692 F.2d 28, 29 (6th Cir. 1982), affg. T.C. Memo. 1981-700; sec. 7454(a); Rule 142.  If respondent does not prove fraud for the taxable year 1966, the statute of limitations will bar the assessment of the deficiency and additions to tax for that year.  Sec. 6501(a) and (c)(1). Petitioner is collaterally estopped to deny fraud for the taxable year 1967 since he pleaded guilty to tax evasion pursuant to section 7201 for that year.  Amos v. Commissioner, 360 F.2d 358 (4th Cir. 1965), affg. 43 T.C. 50 (1964); Arctic Ice Cream Co. v. Commissioner, 43 T.C. 68 (1964).  Moreover, petitioner failed to file a tax return for 1967, so a tax deficiency and addition to tax may be assessed "at any time".  Sec. 6501(c)(3).  Thus, for reasons of fraud and failure to file a return, no limitations period applies to 1967.  Sec. 6501(c)(1) and (3).

Fraud

---

5(...continued)

| | |
|---|---|
| Income from car sales | 55,535.00 |
| Total income | $204,565.00 |
| Total expenses | − 56,036.34 |
| Net income | $148,528.66 |

Fraud is never presumed. <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970). Respondent cannot rely on petitioner's failure to satisfy his burden of proof as to the underlying deficiency for 1966. <u>Otsuki v. Commissioner</u>, 53 T.C. 96, 106 (1969). Section 6653(b), as it read for 1966 and 1967, imposed an addition to tax of 50 percent of the underpayment if any part of the underpayment is due to fraud. To uphold imposition of this penalty, respondent must prove by clear and convincing evidence two elements: (1) the existence of an underpayment of tax each year, and (2) that some part of the underpayment is due to fraud. <u>Hebrank v. Commissioner</u>, 81 T.C. 640, 642 (1983).

Petitioner has admitted the existence of the car-sales scheme which he says began in 1965. Petitioner has admitted that he kept at least a portion of the proceeds from this scheme during 1966 and 1967, the $40,000 he says he invested in the Stables. These proceeds are unreported taxable income to petitioner. Respondent, therefore, has established an underpayment of tax for each year.

Fraud is an intentional wrongdoing. To establish fraud, respondent must show that the taxpayer specifically intended to evade a tax believed to be owing. <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968); <u>Stephenson v. Commissioner</u>, 79 T.C. 995, 1005 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Since intent can seldom be established by direct proof, it must be gleaned from all the facts and circumstances in the entire

record.  Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972).  Fraudulent intent may be inferred from circumstantial evidence, such as proof of conduct the likely effect of which is to mislead or conceal.  Spies v. United States, 317 U.S. 492, 499-500 (1943); Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. in part, revg. and remanding in part T.C. Memo. 1965-246; Stephenson v. Commissioner, 79 T.C. at 1006.

Courts frequently list various factors or "badges of fraud" from which fraudulent intent may be inferred.  Although such lists are nonexclusive, some of the factors this Court has considered indicative of fraud are (1) understatement of income, (2) inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of assets, (6) failure to cooperate with the tax authorities, (7) filing false Forms W-4, (8) failure to make estimated tax payments, (9) dealing in cash, (10) engaging in illegal activity, and (11) attempting to conceal illegal activity.  Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992) (citing Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601).

Petitioner has understated his income.  Although petitioner presented Caplan with a list of some of the missing cars during the inventory, he has not presented any evidence to show he kept

records of his income from this scheme. He engaged in an illegal activity and attempted to conceal that fact from his employer, the bank originating the new car loans, and the dealership's auditors, as well as from the tax authorities. He omitted the income from his 1966 return, and he failed to file a return for 1967.

Based on this course of conduct, we find that petitioner acted fraudulently during 1966, and his 1966 Federal income tax return was fraudulent with the intent to evade tax. The doctrine of collateral estoppel bars petitioner from contesting the addition to tax for fraud under section 6653(b) for taxable year 1967. Amos v. Commissioner, supra; Arctic Ice Cream Co. v. Commissioner, supra. Petitioner pleaded guilty to a charge of receiving taxable income of $92,168.61 in 1967 as to which he willfully and knowingly attempted to evade taxes. Accordingly, petitioner will be held liable for the additions to tax for fraud for both 1966 and 1967, and the statute of limitations does not bar respondent from assessment of the deficiencies and additions to tax for either year.

Diverted Dealership Income

Section 61 defines gross income to mean all income from whatever source derived. This definition encompasses all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). It includes funds acquired

through embezzlement, misappropriation, and the sale of stolen goods.  <u>James v. United States</u>, 366 U.S. 213 (1961); <u>Norman v. Commissioner</u>, 407 F.2d 1337 (3d Cir. 1969), affg. T.C. Memo. 1968-40; <u>Naegle v. Commissioner</u>, 378 F.2d 397 (9th Cir. 1967), affg. T.C. Memo. 1965-212;  <u>Lydon v. Commissioner</u>, 351 F.2d 539 (7th Cir. 1965), affg. T.C. Memo. 1964-27; <u>Schira v. Commissioner</u>, 240 F.2d 672 (6th Cir. 1957), affg. T.C. Memo. 1956-35.

Respondent asserts that petitioner has unreported income for the taxable years 1966 and 1967, in the amounts of $37,636.73 and $148,518.66, respectively, from the sales of cars which petitioner misappropriated from the dealership during those years.  The record shows that petitioner received at least those net amounts.  Petitioner admits to the existence of the car-sales scheme, but alleges that the purpose of the scheme was to provide funds to allow Caplan to keep the dealership.  Petitioner admits to using $40,000 of the proceeds, but insists that is all he stole.  However, substantial amounts of the proceeds were deposited into a bank account over which petitioner had sole access and control.

The "mere receipt and possession of money does not by itself constitute taxable income."  <u>Lashells' Estate v. Commissioner</u>, 208 F.2d 430, 435 (6th Cir. 1953), affg. in part and revg. in part a Memorandum Opinion of this Court.  Where a person collects funds merely as an agent, the funds do not constitute income to

him.  Liddy v. Commissioner, 808 F.2d 312, 314 (4th Cir. 1986), affg. T.C. Memo. 1985-107.  The money that a taxpayer, acting as a conduit, must transmit to someone else is not income.  Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974).

If petitioner had been holding the proceeds under Caplan's direction for the benefit of the dealership, then such funds would not be income to petitioner.  However, petitioner has not presented any evidence as to the disposition of any of these car funds in his bank account.  Petitioner's testimony that he informed Caplan of the missing $40,000 and of Weisberger's checks indicates that Caplan was unaware of these items and that petitioner had great control over this scheme.  Without any evidence to support petitioner's position that he was holding the proceeds as Caplan's agent or as the dealership's agent, we must find that the proceeds from the illegal car sales were income to petitioner.  As petitioner has not shown respondent's figures to be incorrect,  we hold that the net proceeds are taxable income to petitioner.

Stables' Income

Respondent has calculated the Stables' income for the taxable year 1967 and attributed it to petitioner as a dividend. Petitioner contends that respondent has not allowed for all of the Stables' expenses, that he was not an owner of the Stables by

the end of 1967, and that he suffered a loss when Singer "stole" the Stables from him.

Generally, the income of a corporation is taxed to the corporation. A corporation is recognized as a separate legal entity from its stockholders for Federal income tax purposes if either: (1) The formation of the corporation was based on a legitimate business purpose; or (2) after formation, the corporation actually conducted a legitimate business. National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949); Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). Where a corporation constitutes a mere shell and was not either formed or conducted for any nontax business purpose, its existence will be disregarded for Federal income tax purposes even though validly incorporated under State law. Noonan v. Commissioner, 52 T.C. 907, 910 (1969), affd. 451 F.2d 992 (9th Cir. 1971); Wenz v. Commissioner, T.C. Memo. 1995-277.

A dividend is a distribution of property from a corporation to a shareholder out of the corporation's earnings and profits; the entire amount of the dividend is includable in the shareholder's gross income. Secs. 61(a)(7), 301, 316. Dividends may be formally declared or constructive. Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987). "A constructive dividend is paid when a corporation confers an economic benefit on a stockholder without expectation of repayment." Wortham Machinery Co. v. United States, 521 F.2d 160, 164 (10th Cir.

1975); Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306.

There is no dispute as to the Stables' gross receipts from the purses won by its horses. Respondent estimated the Stables' expenses and deductions from third-party sources, no evidence of which was presented. Respondent attributed all of the resulting net income ($16,022.84) to petitioner. Petitioner is correct that respondent did not allow for all of the Stables' expenses in that fees for one of the trainers were not included. However, petitioner is not before this Court on behalf of the Stables to contest its liability, but in his individual capacity; thus, we need not address the correct amount of the Stables' taxable income.[6]

There is no evidence that petitioner received an actual or constructive distribution from the Stables. Respondent has not alleged that the Stables was a sham corporation so that its existence as a separate legal entity should be ignored. We find that the Stables was organized for the business purpose of racing horses and did race its horses. The Stables' income should not be attributed to petitioner as dividend income.

Petitioner has argued that he is entitled to a loss for his share of the Stables which Singer "stole" from him. Section

---

[6] In some cases, taxpayers must establish the correct amount of a corporation's earnings and profits in order to show that the distribution received was a return of a capital contribution rather than a dividend. However, this is not such a case.

165(a) allows for a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. The amount of the deduction is determined using the adjusted basis of the property. Sec. 165(b). Petitioner has not established the date of the loss, nor his basis in the Stables.[7] For these reasons, petitioner is not entitled to a loss deduction.

To reflect the above concessions and holdings,

<u>Decision will be entered</u>

<u>under Rule 155.</u>

---

[7] It appears that after petitioner went to court to contest the Dec. 1967 transfer to Singer, the court's dismissal left petitioner with an uncollectible debt. The loss would be that of the debt, not the Stables, and would have occurred in 1968 at the earliest, not in 1967.