T.C. Memo. 1996-513

UNITED STATES TAX COURT

JACK J. KRAMER, Petitioner $\underline{v}$. COMMISSIONER OF
INTERNAL REVENUE, Respondent

JACK S. KRAMER[1] AND MAXINE C. KRAMER, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 22785-90, 22457-91.     Filed November 19, 1996.

Sidney A. Soltz,[2] for petitioners.

Stanley P. Kaplan,[3] for petitioner in docket No. 22785-90.

---

[1]Although the petition in the case at docket No. 22457-91
was filed on behalf of petitioners Jack S. Kramer and Maxine C.
Kramer, Jack S. Kramer and Jack J. Kramer are the same person.

[2]Mr. Soltz filed the original petitions on behalf of
petitioners in both cases.  At trial, he made an oral motion in
the case at docket No. 22457-91 to dismiss for lack of juris-
diction as to Maxine C. Kramer.  Mr. Soltz died after trial
without filing a brief on behalf of petitioners.

[3]Although at trial Mr. Kaplan entered his appearance on
behalf of Jack J. Kramer in the case at docket No. 22785-90, he
represented petitioner only as a transitional figure after Mr.
Soltz's illness and eventual death; he did no substantive work on
petitioner's case and eventually withdrew as counsel.

Kathleen L. Donohue, Ellen T. Friberg, and Eli J. Dicker, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax for the taxable years 1985 to 1987 as follows:

1. Jack S. & Maxine C. Kramer--docket No. 22457-91

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
| 1985 | $25,766 | $10,191.50 | $2,304.75 | [1] |

[1] Equals 50 percent of interest due on the entire deficiency.

2. Jack J. Kramer--docket No. 22785-90

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6654 | Sec. 6661 |
| 1986 | $338,783 | $254,087 | [1] | $15,981 | $84,696 |
| 1987 | 69,977 | 52,483 | [1] | 3,571 | 17,494 |

[1] 50 percent of the statutory interest applicable on $338,783 and $69,997 for 1986 and 1987, respectively, from the due date of the return to the date of assessment of the tax or, if earlier, the date of the payment.

After concessions, the following deficiencies and additions remain in dispute:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
| 1985 | $25,177 | $6,294.25 | $2,275.30 | [1] |

[1] Equals 50 percent of interest due on the amount of the deficiency.

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6654 | Sec. 6661 |
| 1986 | $287,224 | $368,323.70 | [1] | $14,225.36 | $71,806.00 |
| 1987 | 7,290 | 10,836.00 | [1] | 556.53 | 1,822.50 |

[1]50 percent of the statutory interest applicable on $287,224 and $7,290 for 1986 and 1987, respectively, from the due date of the return to the date of assessment of the tax or, if earlier, the date of the payment.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All references to petitioner are to petitioner Jack Kramer. All references to petitioners for tax year 1985 are to petitioner and Maxine C. Kramer (Maxine), his wife.

The issues for consideration are: (1) Whether petitioners are liable for a deficiency in income tax for tax year 1985, and whether petitioner is so liable for tax years 1986 and 1987; (2) whether petitioners are liable for additions to tax for failure to file and negligence for 1985; and (3) whether petitioner is liable for additions to tax for fraud, underpayment of estimated tax, and substantial understatement for 1986 and 1987.

We hold, based upon the parties' stipulations, respondent's concessions at trial, the entire record, and the findings below, that petitioner has deficiencies that are less than those recomputed by respondent for 1985 and 1986 and the same as respondent recomputed for 1987. We also hold petitioner liable for all determined additions computed on the reduced deficiencies.

We further hold, based upon the parties' stipulations, respondent's concessions at trial, the entire record, and the findings below, that Maxine has no deficiency for 1985 and is therefore not liable for any additions to tax for that year.[4]

## FINDINGS OF FACT

Some of the facts have been stipulated, and are so found. The stipulation of facts and attached exhibits are incorporated herein. The cases were consolidated for trial, briefing, and opinion.

When petitioners filed their petition for 1985, petitioner resided in the Federal Correction Institution at Jesup, Georgia, and Maxine resided in North Miami Beach, Florida. When petitioner filed his petition for 1986 and 1987, he resided in the Metropolitan Correctional Center, Miami, Florida. Throughout 1985-87, petitioner was married to Maxine; they divorced in 1993 after having lived separately since 1989. Petitioner and Maxine have two children, Benjamin (Ben) and Mark. Ben is a convicted drug smuggler, serving a life sentence without possibility of parole. His younger brother, Mark, was convicted and subsequently imprisoned for his role in attempting to help Ben escape from Federal custody.

---

[4]Concurrently with the issuance of this opinion, we deny petitioners' oral motion at trial to dismiss for lack of jurisdiction as to petitioner Maxine C. Kramer in the case at docket No. 22457-91.

For 1985, after obtaining the appropriate extensions, petitioner and Maxine signed and filed a Form 1040 that they styled a "tentative return". The Form 1040 contained no detail concerning income and deductions, although it did list $20,329 on line 56 as the "total tax". The Form 1040 also displayed the following legend at the bottom of page one: "Ongoing Grand Jury Investigation May Materially Affect Tax Liability". Max Forman (Forman), an accountant who performed services for Ben's enterprises, signed the form as tax preparer. Petitioner was aware of his obligation to file Federal income tax returns for 1986 and 1987, but he did not do so for either year.

1. Background

When respondent issued the notices of deficiency, petitioner was serving a prison sentence stemming from his criminal convictions on racketeering and associated charges of conspiracy to commit racketeering and travel and use of facilities to distribute the proceeds of unlawful activity. Petitioner had participated in a series of schemes to launder the profits from Ben's illegal marijuana smuggling operations.

Petitioner became involved in Ben's criminal enterprises as early as 1977, after Ben was first arrested and convicted for marijuana smuggling. Petitioner carried $80,000 in cash of Ben's marijuana smuggling profits to Bel Air, California, to "invest" in an enterprise controlled by Sam Gilbert. Ben received his $80,000 back from an entity called Commercial Factors when he was

released from prison in 1981. After this initial episode, petitioner maintained a social and business relationship with Sam Gilbert.

By November 1983, petitioner had become deeply involved in laundering Ben's marijuana smuggling profits. He met with Sam Gilbert in a Beverly Hills hotel to discuss a plan to launder $12 million in drug smuggling profits[5] through a British Virgin Islands (BVI) entity, to a bank in Liechtenstein. This bank turned the funds into a seemingly legitimate "construction loan" so that Ben, through various entities, was able to invest the proceeds in the Bell Gardens Bicycle Club, Inc. (the card club), a legal, State regulated gambling enterprise, without revealing his participation. Another BVI entity, Troon Mortgage Investments, N.V. (Troon Mortgage), run by Shaun (or Shawn) Murphy (Murphy), subsequently held the note as a vehicle through which Ben could recover the $12 million principal, 15 percent interest on the loan, and an additional 15-percent "kicker".

Ben and Sam Gilbert, along with M. Dale Lyon (Lyon) and Michael Gilbert, the "front men" used to obtain the gambling license for the card club, later formed the entities used to conceal Ben's supposed ownership role in the card club. Sam

---

[5]Ben's share of these funds was $4 million. The other $8 million came from his partners in the drug smuggling enterprise, Randy Lanier and "Tommy", also known as George Brock. By his own testimony, petitioner was to control the laundering of these funds. Petitioner and Ben met Tommy in New York in Sept. 1983 to convince Tommy to invest in the Bell Gardens Bicycle Club, Inc., discussed infra.

Gilbert's attorney, Stephen Fainsbert (Fainsbert), performed many of the legal services necessary to create and operate these entities.[6]

During early 1984, petitioner participated in several meetings that monitored the card club's financing and construction. He also used Forman's[7] services and those of an attorney, Emerson Allsworth[8] (Allsworth), to oversee his and Ben's financial interests. Both Allsworth and Forman, while not initially involved in the actual money laundering, became increasingly aware of the nature of the activities underlying the card club's financing and Ben's actual ownership role.

---

[6]Petitioner, as discussed infra pp. 13-14, would later testify at the criminal trial of Michael Gilbert and Fainsbert as a Government witness. Many of the findings for this background story of petitioner's involvement in Ben's money laundering activities are drawn from petitioner's testimony at this trial in 1993 and his similar testimony at the civil forfeiture trial adjunct to his own criminal trial in 1991. Transcripts of petitioner's testimony from those trials were made part of the record in the trial of the cases at hand.

[7]In addition to signing petitioner's 1985 Form 1040 as return preparer, Forman performed services for Ben's various criminal enterprises, not the least of which was evaluating the investment decisions concerning the card club, in which Ben and his associates, with petitioner's assistance, invested $12 million.

[8]Allsworth, petitioner's longtime friend, served as attorney to Ben's criminal enterprises, for which he was well paid from petitioners' Safra Bank account (see infra pp. 16-17), especially in 1986. Allsworth was listed as President of Hallandale Residential Properties, Inc., the entity created to hold legal title to the house that served as Ben's personal residence. Allsworth also was listed as the registered agent for the various entities associated with the racing boat enterprise described infra.

The card club opened in October 1984. By 1985, Lyon and Sam Gilbert were sending its profits, approximately $1.6 million over the course of 1985 and 1986, back to Ben through their various partnerships, such as LCP Associates. Some of these profits flowed into a trust account controlled by Allsworth. Some went directly to petitioner and some went through Allsworth's trust account and then to petitioner. At least $505,000 flowed through petitioners' joint checking account at Safra Bank in 1986. To further conceal Ben's ownership role in the card club, some of these payments took the form of "loans" to petitioner that he signed for on what Allsworth called "drugstore pads".

Throughout the early 1980's, Ben competitively raced offshore power boats, an expensive sport popular in south Florida at the time. In 1982, Ben created an entity, Apache Racing Team, Inc., through which to conduct his boat racing and building activities, although it was later administratively dissolved while he was still racing and building powerboats. Other entities were created on an ad hoc basis.[9] Allsworth was instrumental in creating many of these entities. Petitioner and Ben used the term "Apache" generically when referring to many of the entities connected with the offshore boat racing, and to

---

[9]Super Chief South came into existence in Aug. 1985 and was dissolved just 15 months later in Nov. 1986. Super Chief, Inc., was created in Jan. 1984 and not dissolved until 1992, well after Ben, petitioner, and all of the others had been arrested, tried, and convicted on various smuggling and money laundering charges.

identify expenditures made on behalf of one or another of the entities that supported some aspect of Ben's boat racing.

The most important of these entities was Fort Apache, Inc. (Fort Apache), through which Ben and petitioner developed a marina. They used Fort Apache to lease back the marina from another entity known as Marina Bay Associates, ostensibly owned by Lyon and Michael Gilbert. This partnership held legal title to the marina in order to dissociate its assets from Ben's name. In order to allow Ben to fund marina development while still concealing his ownership role, Lyon used a funding scheme similar to that used for the card club.[10] Petitioner, acting as Ben's agent, became the president and sole board member of Fort Apache, although without an independent ownership interest of his own.

Ben and petitioner wanted to use the marina to help them persuade Lamborghini Motor Co. to custom-build high-performance engines for the boats that Apache Boats, Inc., built for Ben to race. Funds to purchase land for the marina came through Allsworth's trust account. Len-Ed Construction, Inc. (Len-Ed), a

---

[10]Ben's attempts to conceal his ownership of the marina and the card club destroyed his ability to later liquidate and recover his interests. None of the entities that legally owned the marina or the card club reflected Ben's ownership interest as initially arranged with Sam Gilbert. The "safeguards" for Ben's interests that Sam Gilbert put into place included holding the resignation letters of the principals of Marina Bay Associates and LCP Associates. But, as petitioner testified, the only real safeguard was Ben's trust in Sam Gilbert. This meant that Ben had no recourse but to accept the consequences when the Gilberts reneged on their various arrangements with him. The Gilberts had the upper hand until Federal agents seized the various assets, beginning with the marina in Aug. 1987. See infra pp. 11-12.

corporation partially owned by Len Dublin (Dublin), a longtime friend of the Kramer family, built the marina, which eventually opened in October 1985.

Petitioner participated in the money laundering schemes because of a mixture of paternal loyalty, greed, and a desire for an enhanced appearance of personal stature. Ben dominated petitioner and exercised a powerful influence over petitioner in his criminal activities. Ben continued to exercise that influence over petitioner throughout the mid-1980's.

Ben's promise to petitioner of a large "salary", $360,000 per year, also helped entice petitioner to participate in these schemes. The card club investment also provided petitioner with the opportunity, at least in his own mind, to move to California to oversee the Kramer interests and act as Ben's personal representative.[11]

When British police arrested Murphy in Tortola, BVI, in April 1986, the empire that petitioner had helped Ben build with laundered proceeds of his drug smuggling activities began to come apart. At about the same time, Ben's erstwhile partner, Sam

---

[11]Petitioner prepared to relocate to California to such a degree that Michael Gilbert even leased a house for him. About this time, in April 1984, petitioner broke his ankle in a boating accident aboard one of Ben's new offshore power boats. The severity of his injury effectively postponed petitioner's further preparations to move to California for several months. Whether the injury itself genuinely caused the change in petitioner's eventual plans or merely served as a convenient excuse to keep him out of California and away from the card club is unclear from the record.

Gilbert, reneged on the terms of the note that Troon Mortgage held on the card club by eliminating the 15-percent "kicker" on the loan payments. Following Murphy's arrest, petitioner met Lyon and Fainsbert at the Miami Marriott Hotel, ostensibly to develop a plan for Ben to liquidate his interest in the marina. Lyon and Fainsbert, in Allsworth's presence, began dictating to petitioner what would be done with the marina. Fainsbert also informed petitioner at the same meeting that the "kicker" from the card club had been eliminated. Petitioner protested vociferously. But Fainsbert told him in no uncertain terms that Sam Gilbert and Ben had already discussed and arranged this change.

Ben and petitioner then decided to liquidate Ben's interest in the card club and recover the $12 million investment by paying off the note held by Troon Mortgage. Murphy's arrest prompted petitioner to travel to Hong Kong in May or June 1986 to create another entity to replace Troon Mortgage. Ben and petitioner also attempted, albeit unsuccessfully, to liquidate Ben's interest in the marina by selling it. As late as September or October 1986, they had been unsuccessful at these efforts. Throughout most of 1987, petitioner participated in a convoluted effort to recover $9.5 million of the original $12 million investment in the card club. This effort ended in failure at a meeting petitioner had in Zurich, Switzerland, in late October or early November, with not clearly identified underworld figures.

In May 1987, in what was either a last ditch attempt to conceal Ben's ownership of the marina, or the recognition that the Gilberts had forced Ben out, petitioner abandoned management of the marina and other boat racing assets to Michael Gilbert and Marina Bay Associates. Ben's hopes of ever recovering his investment in the marina terminated in August 1987, when Federal law enforcement officials arrested him and seized the marina and other Apache power boat entities and assets. By that time, petitioner had moved to Atlantic City, where he and Maxine remained through October 1987, in an effort to "get away from it all".

For the remainder of 1987, petitioner, in addition to trying to recover the $9.5 million from the card club investment, delivered bank checks for $500,000 to Ben's criminal attorneys, and $250,000 to his own attorney as retainers for services to be rendered in the impending grand jury proceedings and criminal trials. Petitioner also succeeded in funneling an additional $1 million into Apache Power Boats. These funds, which exceeded $1.75 million, came through the same channels through which petitioner had tried unsuccessfully to recover the card club investment.

In December 1989, Federal agents arrested petitioner. Petitioner was indicted, tried, and convicted for crimes associated with the money laundering and other activities described above, as well as others not specifically detailed

here, sentenced to 19 years' imprisonment, and fined $200,000. A lien for $9.5 million was recorded against petitioner.

In hopes of obtaining a lighter sentence, petitioner entered into agreements to cooperate with authorities and testify at the criminal trials of some of Ben's associates. The agreements were never carried out because petitioner, by his own admission, lied to the Government during the initial depositions.[12] However, petitioner ultimately did testify both at a civil forfeiture trial adjunct to his own criminal trial and at the criminal trial of Fainsbert and Michael Gilbert, in an effort to reduce his sentence.[13]

## 2. The Tax Years in Issue.

During 1985-87, petitioner helped launder profits of Ben's marijuana smuggling operations. During 1985 and 1986, as part of

---

[12]Petitioner testified at the civil forfeiture trial adjunct to his criminal trial that he lied at the deposition to protect Allsworth, his longstanding friend and attorney for Ben's criminal enterprise.

However, as he testified at the civil forfeiture trial on cross-examination, petitioner was also apparently concerned about the possible effects of his testimony on any possible criminal indictment that could result against Maxine as well as on his own exposure to further criminal prosecution.

Cross-examination at the civil forfeiture trial also brought out that petitioner also lied to conceal the $9.5 million left in limbo in Europe in the aftermath of petitioner's abortive attempts to recover the card club investment. At the Fainsbert-Michael Gilbert criminal trial, he also testified to this lie.

[13]Petitioner denied that the Government offered him inducements for his actual testimony at the Fainsbert/Michael Gilbert criminal trial. He testified that the Government would make a "recommendation" only to the judge about his future incarceration.

the money laundering scheme, Sam Gilbert Associates, Inc. (SGA), owned by Sam Gilbert, made payments to petitioner labeled "wages" on W-2 Forms and withheld taxes therefrom.[14]  In 1987, petitioner rendered services to Fort Apache, Inc., and received $17,000 wages, with taxes withheld.

The Internal Revenue Service audited petitioner, first for 1986 and 1987, and then for 1985.  During neither audit did petitioner produce the books and records necessary to substantiate items of income, gain, loss, or deduction.  However, some documentation was given to respondent during the audits.  On advice of counsel, petitioner did not cooperate with respondent during the audit for 1986 and 1987.  Because of the lack of records and failure to cooperate by petitioner, respondent used the bank deposits method to determine petitioner's income for the 3 years at issue.

During these 3 years, petitioner operated three bank accounts in his and Maxine's names:  Safra Bank joint checking account (hereinafter Safra), Barnett Bank Joint Money Market Account (hereinafter Barnett money market), and Barnett Bank joint checking account (hereinafter Barnett joint checking).  Safra was active beginning in December 1985, and closed in July 1987.  The other two accounts remained open during the entire 3-year period.  Safra, and to a lesser extent Barnett money market,

---

[14]The payroll checks from SGA, while not necessarily for services rendered, did provide support for petitioner during 1983-86.

were conduits through which large amounts of money flowed from 1985 to 1987. The record explains some, but not all, of these flows.[15] Petitioner earned interest, which he did not report as income, on the deposits in these accounts during each of the 3 years. Petitioner used Barnett joint checking only for personal purposes throughout the 3-year period.

During this period, petitioner had no other sources of funds such as "cash hoards", except for an inheritance of $19,641 from his mother, which was deposited into Barnett money market in November-December 1985. In 1985, petitioner sold a house and bought a condominium at Turnberry Isle, a luxury residential community. Petitioner had a mortgage loan on the condominium with payments of approximately $2,000 per month. He also owned a 1984 Mercedes automobile.

Profits from Ben's marijuana smuggling funded Fort Apache while petitioner was its president. Petitioner disbursed funds to Fort Apache and other of Ben's enterprises from deposits that others, such as LCP Associates, made in Safra and Barnett money market.

In December 1985, Len-Ed deposited $85,000 into Safra; $50,000 of this deposit went to two of the racing entities: $35,000 to Apache Power Boats and $15,000 to Team Apache. The remainder of the funds in that account rolled over into 1986. In

---

[15]The tables summarize the inflows and outflows for the three accounts, petitioner's explanations for some of these transactions, and respondent's concessions on others.

1985, petitioner also disbursed a total of $29,465.80 from Barnett money market to support the racing efforts. However, petitioner never explained or established the source of these funds. The $85,000 in Safra could not have been so used because it was deposited in December 1985, and the Barnett expenditures were made during February-December 1985. The record does not show a transfer between the two accounts. Tables 1 through 3 in the appendix detail these transactions. Table 4 reconstructs the bank deposits and summarizes the various explanations; as set forth therein, petitioner's net unexplained bank deposits amount to $29,480.75 for 1985. Table 5 calculates petitioner's taxable income for 1985 based upon the net unexplained bank deposits and items of income and deductions that the parties stipulated to or were included in respondent's notice of deficiency for that year.

The bulk of the unexplained bank deposits at issue were deposited and disbursed in 1986, largely through Safra. Virtually all the disbursed funds supported some aspect of the powerboat racing entities. Petitioner disbursed funds for freight delivery, insurance, advertising, work on the boats, and rigger services. Petitioner also disbursed $100,000 to Len-Ed as payment for services related to construction of the marina. Dublin was a designated recipient for a portion of the $505,000 that LCP Associates, controlled by Lyon and others, deposited in Safra during April as part of Ben's remittances from the card club profits.

Petitioner disbursed funds totaling $50,628.44 from Safra to Allsworth on a regular basis throughout 1986, either into Allsworth's trust account or to him personally. Some of these payments supplemented the marina land purchase that Allsworth made with funds that he received directly from LCP Associates.

Of the funds deposited into Safra during 1986, $200,000 came from a loan from Safra Bank. Respondent made no adjustment with respect to those funds in the notice of deficiency for 1986 and 1987. The funds were deposited into the account in July and August. The loan covered the $93,582 overdraft on Safra that existed at the end of June 1986. Disbursements made in June, which total $206,500 and remain unexplained by the record, caused the overdraft. The unexplained deposits for 1986, summarized in Table 9, are decreased by the amount of the loan.

None of the 11 debits to the account in June 1986 was smaller than $2,000 and all were for amounts rounded to the nearest thousand or five hundred dollars. The largest debits were for $50,000 (two checks for that amount), $30,000, and $20,000 (two checks for that amount). By the end of 1986, petitioner had disbursed all the funds that had been deposited during December 1985-October 1986.

Based upon exhibits stipulated by both parties, the total deposits into Safra during 1986 exceed by $75,200 the amount reported on Schedule C in respondent's notice of deficiency for 1986 and 1987.

Petitioner explained only $14,230.89 of the $133,523.32 that petitioner and Maxine disbursed from Barnett money market in 1986. The $14,230.89 represents expenditures for accounting services for Ben's enterprises or for the racing boat enterprises. The source of another $30,204.45 is undisputed: a refund check from the IRS.

Table 9 reconstructs the bank deposits for 1986 and summarizes the various explanations; as set forth therein, petitioner had net unexplained bank deposits of $99,077.39 for 1986. Table 10, using income and deductions stipulated by the parties, or calculated in respondent's notice of deficiency for 1986 and 1987, calculates petitioner's taxable income for 1986.

In 1987, the Safra account was inactive and closed in July of that year. No deposits were made other than one for $400 to correct an overdraft.

During 1987, Barnett money market continued to be active. However, only $4,175 was deposited into the account, while petitioner spent $12,650.93 supporting Ben's enterprises. Since the expenditures tend to explain the deposits, only $4,175 is credited to explaining 1987 deposits. The balance is applied to explaining their source: the 1986 deposits. Petitioner's disbursements from this account paid Apache Power Boat's building rental and $4,850.93 for property taxes for Ben's property. Funds also went to Allsworth's trust account.

Respondent conceded a $150,000 loan from petitioner's sister-in-law used to post petitioner's bail. This corresponds

to a $150,000 deposit made into Barnett joint checking in December and a check written for the same amount on the same day. Based upon the exhibits, the total deposits made into Barnett joint checking exceed by $10,000 the amount shown in respondent's notice of deficiency for 1986 and 1987 as having been deposited into the account.

Table 14 reconstructs the net unexplained deposits for 1987, $41,899.34, based on the record. Because the parties stipulated a smaller amount, $36,088, we use that lesser figure attributable to unexplained bank deposits to calculate petitioner's taxable income for 1987. Table 15 calculates petitioner's taxable income for 1987 based upon the stipulated unexplained bank deposits and income items and deductions that either the parties stipulated or respondent used in her notice of deficiency for 1986 and 1987.

Based upon respondent's concessions and the above findings of fact, the unexplained bank deposits included in petitioner's gross income for each year are:

| | | |
|---|---|---|
| 1985 | $29,480.75 | (From Table 4) |
| 1986 | 99,077.39 | (From Table 9) |
| 1987 | 36,088.00 | (From Table 14) |

Based upon respondent's statutory notices of deficiency, her concessions, and the unexplained bank deposits, petitioner's income and deductions are:

| Item | 1985[1] | 1986[2] | 1987[3] |
|------|---------|---------|---------|
| Net unexplained bank deposits | $29,480.75 | $99,077.39 | $36,088 |
| Wages | 32,199.00 | 34,020.00 | 17,000 |
| Interest income | 11,777.00 | 7,922.00 | 388 |
| Other income | 3,468.00 | - 0 - | - 0 - |
| Gross income | 76,924.75 | 141,019.39 | 53,476 |
| Stipulated deductions | (28,044.00) | (31,362.92) | (23,394) |
| Taxable income | 48,880.75 | 109,656.47 | 30,082 |

[1]From Table 5.
[2]From Table 10.
[3]From Table 15.

OPINION

The convoluted facts and missing records in these cases, attributable in part to the criminality of petitioner's activities, have resulted in a fragmentary record, all the gaps in which have not been fully explained by the parties.

Petitioner's counsel, Mr. Soltz, became ill shortly after trial, and died without filing a brief. Although Mr. Soltz had originally associated with Mr. Kaplan to obtain his help in preparing a brief, we granted Mr. Kaplan's motion to withdraw, filed shortly after Mr. Soltz's death. Petitioner did not retain new counsel and declined to file an answering brief, citing his limited education. Respondent then decided not to file a reply brief.

Respondent's opening and only brief does not reconcile the differences between respondent's notices of deficiency and the stipulated bank record exhibits.[16]  As a starting place for the deficiency calculations, Schedules C in the deficiency notices listed certain amounts as the total deposits, from which the net unexplained bank deposits were then calculated.  For 1986, these

_____

[16]These differences and the failure of those exhibits to fully substantiate the amounts that respondent presents in the notices of deficiency bring up the issue of who bears what burden, especially in regard to the accuracy of the computations in the notice of deficiency.

Judge Tannenwald, in his concurring opinion in Llorente v. Commissioner, 74 T.C. 260, 275 (1980) (Tannenwald, J., concurring), affd. in part and revd. and remanded in part 649 F.2d 152 (2d Cir. 1981), wrote that "All of the decided cases are in agreement that the presumption of correctness of a notice of deficiency does not cause the notice to be evidence as such, and, that, at least initially, the taxpayer has the burden of proof." (Citations omitted.)  He later wrote that "This Court has consistently made it clear that, even in cases involving unreported income, we will only shift to respondent the burden of coming forward with evidence".  O'Reilly v. Commissioner, T.C. Memo. 1994-61.  In the seminal unreported income from illegal activities case, Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979), revg. 67 T.C. 672 (1977), the Commissioner failed to produce any records to "substantiate the computations made by the IRS agent", which was one component of a decision by the Court of Appeals for the Ninth Circuit to require some linkage between the taxpayer's unreported income and alleged illegal activity.

The situation here is somewhat different.  Respondent made deficiency determinations and then conceded certain items.  She also stipulated to the bank exhibit records, thus satisfying her burden of coming forward with evidence.  A problem arises because that evidence does not match the determinations in the notices of deficiency, and respondent's brief does not explain the differences.  However, for the reasons described above, the burden of proof has not shifted from petitioner.

amounts do not correspond to the total deposits recorded in the bank records. The record indicates that the deposits for that year total $1,043,161.86. Schedule C of the notice of deficiency for 1986 and 1987 shows the total deposits in the three accounts to be $975,648.36. Nothing in the record or respondent's brief explains this difference or why respondent determined the numbers she did. The amounts of respondent's concessions and how she arrived at them are also unclear.

In the stipulations, respondent claimed $593,716 in unexplained deposits for 1986, which petitioner denied. But, based on the record, and using respondent's concessions and known non-income items, that number cannot be reconciled with the actual deposits in that year, nor can it be reconciled with respondent's total for the 1986 deposits. Because petitioner denies the income, the $593,716 has not been stipulated by the parties.

We are presented with a similar problem for 1987, although, as shown in tables 13 and 14, the cause seems to be arithmetical error in one case and an oversight in the other. Respondent also never explained her stipulation that the 1987 unexplained bank deposits were only $36,088. Using the bank records as a starting point, the record supports a different and slightly larger number, $41,899.34. In determining the unexplained bank deposits for each of the years, we went back to the bank deposits, as listed in the record, to recalculate the amounts that remain

unexplained based upon the record and concessions made by respondent.  Tables 4, 9, and 14 summarize the unexplained deposits and expenditures for the 3 years.

Issue 1.  Deficiencies in 1985, 1986, and 1987

Section 61 provides the general rule that gross income includes income from whatever source derived.  To facilitate calculating that income, section 6001, as interpreted by section 1.6001-1(b), Income Tax Regs., requires taxpayers "to keep such records as will enable the district director to determine the correct amount".  In the absence of such records, respondent may use indirect methods of proof of income such as the bank deposits method.  DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989); Estate of Mason v. Commissioner, 64 T.C. 651, 657 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Estate of Haque v. Commissioner, 45 B.T.A. 104 (1941), affd. 132 F.2d 775 (2d Cir. 1943), affd. sub nom. Commissioner v. Uniacke, 132 F.2d 781 (2d Cir. 1942).  Respondent's determinations are entitled to a presumption of correctness, and petitioner bears the burden of proof to rebut that presumption by a preponderance of the evidence.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); see also Reid v. Commissioner, T.C. Memo. 1974-185, affd. without published opinion 516 F.2d 896 (2d Cir. 1975) (using the bank deposits method, deducting identifiable items, and regarding the rest as unexplained deposits and thus taxable income, puts the

burden of proof on petitioner).  Respondent's concessions on one or more issues do not destroy the presumption of correctness, nor do they shift the burden of proof on issues remaining in dispute. United States Holding Co. v. Commissioner, 44 T.C. 323, 328 (1965); see also Mensik v. Commissioner, 37 T.C. 703, 725 (1962), affd. 328 F.2d 147 (7th Cir. 1964); Gobins v. Commissioner, 18 T.C. 1159, 1168-1169 (1952), affd. 217 F.2d 952 (9th Cir. 1954) (concessions by the Commissioner in an unexplained bank deposit case did not destroy the presumption of correctness of the deficiency, nor did it shift the burden of proof to the Commissioner).

Ordinarily, the presumption of correctness does not allow "looking behind the notice of deficiency to examine the evidence used by the Commissioner".  Petzoldt v. Commissioner, supra at 687-688 (citing Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977)).  However, for cases involving illegal activity as the source of income, the Court of Appeals for the Eleventh Circuit has adopted the Weimerskirch doctrine, which requires both an evidentiary linkage of illegal income-producing activity with the deficiency determination, Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993), affg. T.C. Memo. 1991-636 (citing Weimerskirch v. Commissioner, supra at 362), and records to substantiate the IRS

computations.[17]  Weimerskirch v. Commissioner, supra at 361; see

also Hobart v. Commissioner, T.C. Memo. 1995-517.  But, the

required showing of an evidentiary linkage is only "minimal",

Blohm v. Commissioner, supra at 1549 (citing Carson v. United

States, 560 F.2d 693, 697 (5th Cir. 1977) (quoting Gerardo v.

Commissioner, 552 F.2d 549, 554 (3d Cir. 1977), affg. in part and

revg. in part T.C. Memo. 1975-341)), and petitioner's admitted

participation in money laundering on Ben's behalf clearly

provides such a linkage.  Petitioner's admission establishes not

only that he was linked to illegal activity, but that he received

income from that illegal activity.  Much of the funds that flowed

through Safra and Barnett money market in 1985 and 1986 came from

the card club through LCP Associates.

Because of the "obvious intent of that Congress to tax

income derived from both legal and illegal sources, to remove the

incongruity of having the gains of the honest laborer taxed and

the gains of the dishonest immune", funds from illegal sources

have long been considered taxable income.  James v. United

States, 366 U.S. 213, 218 (1961) (quoting Rutkin v. United

States, 343 U.S. 130, 138 (1952)).  However, in James v. United

---

[17]As discussed supra pp. 20-22, respondent did not
substantiate her deficiency calculations and stipulated evidence
that would support different--although not necessarily smaller--
amounts.  But the evidence does substantiate the order of
magnitude of the IRS computations.  The differences are
relatively insignificant (the biggest discrepancy is the $75,200
understatement by the statutory notice of deficiency for 1986 and
1987 as compared to the bank records, which is less than 10
percent of the actual deposits of $849,128).

States, supra (citing Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)), as in other cases, the wrongdoer obtained "complete dominion" over his illegal gains.

If petitioner could show that he accrued no gain or benefit and had mere dominion over the funds without control, he could rebut the presumption that the funds are taxable income to him. Brittingham v. Commissioner, 57 T.C. 91, 101 (1971). Petitioner posits just that theory: While he admits that the source of funds was illegal, he maintains that Safra and to a lesser extent Barnett money market were mere conduits for funds that supported the various enterprises that Ben caused to be created to launder the proceeds of his illegal marijuana smuggling. Petitioner argues that he lacked the requisite dominion and control because he was not free to use the funds at will. See Ianniello v. Commissioner, 98 T.C. 165, 173 (1992) (citing Rutkin v. United States, supra at 137).

Petitioner relies upon his own testimony as his primary proof. "Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions", Quock Ting v. United States, 140 U.S. 417, 420 (1891); Greenfeld v. Commissioner, 165 F.2d 318, 319-320 (4th Cir. 1947), affg. a Memorandum Opinion of this Court dated Feb. 26, 1947, and courts are not obliged to accept testimony of interested parties that is not credible and is not corroborated by any other evidence.

Davis v. Commissioner, 88 T.C. 122, 141-142 (1987), affd. 866 F.2d 852 (6th Cir. 1989); see also Anaya v. Commissioner, T.C. Memo. 1991-91, affd. 983 F.2d 186 (10th Cir. 1993). However, that is not the case here.

Petitioner corroborated his testimony on the use of the bank deposits with bank statements for each of the three accounts and exhibits summarizing various annotated checks. His testimony at the trial in these cases is consistent with his earlier testimony in the criminal trial of his former associates Michael Gilbert and Fainsbert and the civil forfeiture trial adjunct to his own criminal trial. The flows of funds that petitioner did explain were almost exclusively directed towards the entities associated with Ben's powerboat racing, paying Allsworth for his legal and other services, and paying for other costs that Ben had incurred. As in Brittingham v. Commissioner, the facts are persuasive. Petitioner's testimony, corroborated as it is, constitutes compelling evidence that tips "the scales in * * * [petitioner's] favor", Brittingham v. Commissioner, supra at 101, and, insofar as these particular expenditures are concerned, enables him to meet his burden of proof.

Respondent did not controvert petitioner's testimony that he made each of these disbursements at Ben's behest. Respondent also did not dispute petitioner's assertion that Ben, not he, controlled and owned the various Apache enterprises. Respondent's failure on this count is telling because the

circumstantial evidence strongly corroborates petitioner's story. The May 1986 meeting in which Fainsbert told petitioner that the 15-percent "kicker" had been eliminated is just one instance of petitioner as a subordinate participant being presented with a fait accompli. Another such instance is how, after breaking his ankle in the boating accident, petitioner never went to California to assume the role he had sought as overseer of Ben's investment in the card club, see supra note 11. These incidents help to demonstrate the tenuousness of petitioner's position in Ben's enterprises and his lack of any real ownership interest in them. Also persuasive to us is petitioner's lack of involvement in the underlying drug smuggling activities.

Even after accepting petitioner's explanations for the disbursements to and from the various bank accounts, significant amounts still remain unaccounted for and unexplained in each of the 3 years. Petitioner failed to discharge his burden of proof with regard to all the funds that came into his accounts. Indeed, petitioner used funds from Barnett joint checking exclusively for his own personal use. Only one deposit in that account is not income: a $150,000 loan to petitioner by his sister-in-law. The record does show that funds going through Safra, and, to a lesser extent, Barnett money market, came from the card club via LCP Associates and other entities. But, without more, merely showing the source is insufficient to rebut the presumption that they were income to petitioner.

Accordingly, we find that petitioner has unexplained bank deposits in the amounts set forth in our concluding findings, with resulting decreased deficiencies for 1985 and 1986. The unexplained deposits for 1987 are as the parties have stipulated for that year.

Issue 2. Additions to Tax for 1985

a. Failure to file a return--section 6651

Section 6011(a) requires that "any person made liable for any tax * * * shall make a return or statement according to the forms and regulations prescribed by the Secretary." Treasury regulations require that returns contain "therein the information required by the applicable regulations or forms." Sec. 1.6011-1(a), Income Tax Regs. Failure to file a return subjects a taxpayer to additions to tax under section 6651(a)(1) of "5 percent for each additional month * * * not exceeding 25 percent".

To be a return that starts the period of limitations, a document must "purport to be a specific statement of the items of income, deductions, and credits in compliance with the statutory duty to report information and `to have that effect it must honestly and reasonably be intended as such'". Beard v. Commissioner, 82 T.C. 766, 778 (1984), affd. 793 F.2d 139 (6th Cir 1986) (quoting Florsheim Bros. Drygoods Co. v. United States, 280 U.S. 453, 462 (1930)). However, a document may be sufficient to be a return, even if not perfectly accurate or complete, "if

it purports to be a return, is sworn to as such * * * and evinces an honest and genuine endeavor to satisfy the law.  This is so [even] though at the time of filing the omissions or inaccuracies are such as to make amendment necessary."  Zellerbach Paper Co. v. Helvering, 293 U.S. 172, 180 (1934).

In 1985, petitioner filed appropriate extensions and eventually filed what he labeled a "tentative return" on a Form 1040.  The document did not include any information on income, deductions, credits or exclusions, although it did list $20,329 in line 56 as the "total tax".  It also displayed the legend: "Ongoing Grand Jury Investigation May Materially Affect Tax Liability".  Even with an "estimated tax" listed in the "total tax" line, the form still lacked the minimum information prescribed by the regulations.[18]  It did not evince an honest and genuine endeavor to satisfy the law.  Id.; see also, e.g., Porth v. United States 426 F.2d 519, 522-523 (10th Cir. 1970) (name and address on a form is insufficient to be a valid return because it fails to "contain any information relating to the taxpayer's income from which the tax can be computed * * * within the meaning of the Internal Revenue Code or the regulations adopted by the Commissioner"); United States v. Jordan, 508 F.2d 750, 752 (7th Cir. 1975) (same); Ross v. Commissioner, T.C. Memo. 1984-27

---

[18]"Each taxpayer should carefully prepare his return and set forth fully and clearly the information required to be included therein.  Returns which have not been so prepared will not be accepted as meeting the requirements of the Code."  Sec. 1.6011-1(b), Income Tax Regs.

(return form without information with which to calculate a tax liability, containing approximately 60 references to "Object Self Incrimination" is not a tax return).

A taxpayer who fails to file a return bears the burden of showing that: (1) His failure to file did not result from "willful neglect"; and (2) he had reasonable cause for failure to file the return. Sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985). United States v. Boyle, supra at 245-246, defines willful neglect as "a conscious, intentional failure or reckless indifference." Whether petitioner's filing of the "tentative return" sufficiently rebuts the presumption of "a conscious, intentional failure" is a question of fact on which petitioner presented no evidence.

Petitioner must also show, by a preponderance of the evidence, that he had reasonable cause to fail to file a return, a question determined in the "instant circumstances". Id. at 246-247. Petitioner presented no evidence on this point beyond submitting the "tentative return" as an exhibit, perhaps in an attempt to allow us to draw an inference that his uncertainty regarding the outcome of an ongoing criminal investigation constituted reasonable cause not to file a return. Any argument along that line must fail. Pending criminal investigations do not excuse a failure to file a return, United States v. Sullivan, 274 U.S. 259 (1927); United States v. Malquist, 791 F.2d 1399

(9th Cir. 1986), even if the taxpayer is asserting his Fifth Amendment privilege against self-incrimination, see Kirschbaum v. Commissioner, T.C. Memo. 1989-526. The least a taxpayer must do to cause the period of limitations to start to run is to file an appropriate return and then assert the Fifth Amendment privilege against self-incrimination by refusing to answer specific questions. United States v. Egan, 459 F.2d 997, 998 (2d Cir. 1972). Petitioner failed to do that. His omissions of data on income, deductions, and credits and cloaking that omission with the legend on the form demonstrate an attempt not to disclose more than the Government might ultimately find in the criminal investigation. Those omissions do not discharge petitioner's obligation to provide respondent with sufficient data from which his income tax liability can be computed. United States v. Daly, 481 F.2d 28, 29-30 (8th Cir. 1973); Porth v. United States, supra at 523; Reiff v. Commissioner, 77 T.C. 1169, 1178-1179 (1981).

Accordingly, we find that petitioner failed to show either that he had reasonable cause not to file a return or that his failure to file was not due to willful neglect. Petitioner is therefore liable for the addition to tax under section 6651(a)(1) for 1985.

b.  Additions to tax for negligence--section 6653(a)

Respondent also determined a 5-percent penalty on underpayments under section 6653(a)(1) and an additional penalty

of 50 percent of interest due on the underpayment under section 6653(a)(2), based on her determination of petitioner's negligence. Section 6653(c)(1) defines an underpayment as, among other things, a deficiency as defined in section 6211(a). As discussed supra in Issue 1, we find that there will be a reduced deficiency against petitioner for 1985.

Section 6653(a), as applicable to the 1985 tax year, does not define negligence. It makes no real distinction between negligence and "disregard of rules and regulations". For purposes of this section, courts have generally followed Marcello v. Commissioner, 380 F.2d 494, 506 (5th Cir. 1967), affg. in part and revg. and remanding in part 43 T.C. 168 (1964), in holding that "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances". See also Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent determined the negligence additions in light of petitioner's admitted failure to maintain adequate records during 1985; such failure supports and sustains a finding of negligence. Harris v. Commissioner, 745 F.2d 378 (6th Cir. 1984), affg. T.C. Memo. 1982-410; Mack v. Commissioner, 429 F.2d 182, 184 (6th Cir. 1970) (citing Marcello v. Commissioner, 380 F.2d at 506-507, 509, 511), affg. T.C. Memo. 1969-26; Cox v. Commissioner, 54 T.C. 1735, 1745 (1970) (Court found negligence based upon the failure to keep adequate records in light of the total record). The record herein strongly supports the

conclusion.  That the parties stipulated the lack of records during the audit and respondent used the indirect bank deposits method to show income further demonstrate that petitioner failed to maintain adequate records.

Petitioner bears the burden of proof to show that he was not negligent.  Rule 142(a); Patterson v. Commissioner, 740 F.2d 927, 930 (11th Cir. 1984)(citing Marcello v. Commissioner, 380 F.2d at 506-507), affg. T.C. Memo. 1983-655.  Petitioner must furnish evidence to show that he exercised reasonable care--in this case by showing that he did indeed keep adequate records.  However, petitioner never addressed this issue on the record at trial, and of course, he has not filed a brief.  In view of the lack of evidence rebutting respondent's determination, we find that petitioner is liable for the additions to tax under sections 6653(a)(1) and (2), based upon the deficiencies to be determined in the Rule 155 computation.

Issue 3.  Additions to Tax for 1986 and 1987

Respondent determined that petitioner was liable for additions to tax under three different Code sections: (1) section 6653(b) for civil fraud; (2) section 6661 for failing to pay estimated tax; and (3) section 6654 for substantial underpayment of tax.

a.  Civil tax fraud--section 6653(b)

The addition to tax for fraud is a civil sanction provided primarily to safeguard the revenue and recoup the heavy costs of

investigating tax fraud.  <u>Helvering v. Mitchell</u>, 303 U.S. 391,
401 (1938); see also <u>Zand v. Commissioner</u>, T.C. Memo. 1996-19;
<u>Hobart v. Commissioner</u>, T.C. Memo. 1995-517.  These policies
undergirding the additions for civil tax fraud obviate any
challenges based on theories of double jeopardy and excessive
fines arising from the forfeiture proceedings and petitioner's
criminal trial, and the loss of liberty and fines stemming
therefrom.[19]

---

[19]The Court of Appeals for the Fourth Circuit recently
reaffirmed the principle of <u>Helvering v. Mitchell</u>, 303 U.S. 391,
401 (1938), that the civil tax fraud addition does not result in
double jeopardy in the wake of more recent Supreme Court
decisions that seemingly called that principle into question.
<u>Thomas v. Commissioner</u>, 62 F.3d 97 (4th Cir. 1995), affg. T.C.
Memo. 1994-128; see also <u>McNichols v. Commissioner</u>, 13 F.3d 432,
434-435 (1st. Cir. 1993) (rejecting taxpayer's argument, citing
"an insurmountable wall of cases" beginning with <u>Helvering v.
Mitchell</u>, <u>supra</u>, and then distinguishing civil forfeiture as
entirely distinct from civil tax liabilities), affg. T.C. Memo.
1993-61; <u>United States v. Alt</u>, 83 F.3d 779, 782 (6th Cir. 1996)
(quoting <u>United States v. Halper</u>, 490 U.S. 435, 446 (1989):  "the
Government is entitled to rough remedial justice, that is, it may
demand compensation according to somewhat imprecise formulas
* * * without being deemed to have imposed a second punishment
for the purpose of double jeopardy analysis"); <u>United States v.
Brennick</u>, 908 F. Supp. 1004, 1009 (D. Mass. 1995) (reaffirms the
continuing vitality of <u>Helvering v. Mitchell</u> in the wake of
recent Supreme Court decisions in <u>United States v. Halper</u>, <u>supra</u>,
<u>Montana DOR v. Kurth Ranch</u>, 511 U.S. 767 (1994), and <u>Austin v.
United States</u>, 509 U.S. 602 (1993), noting that the Supreme Court
approval of <u>Mitchell</u> in <u>Halper</u> and <u>Kurth Ranch</u> "strongly
indicates that the Court did not intend to overturn <u>Helvering [v.
Mitchell</u>] <u>sub silentio</u>"); <u>Ianniello v. Commissioner</u>, 98 T.C. 165
(1992).

For the 2 tax years at issue, the fraud additions under 6653(b)(1) are two-fold. First, a taxpayer is liable for 75 percent of the underpayment attributable to fraud. Sec. 6653(b)(1)(A). However, that effectively means that the taxpayer who fails to show that part of the underpayment is not attributable to fraud can be liable for 75 percent of the entire underpayment. Sec. 6653(b)(2). Second, section 6653(b)(1)(B) calls for an addition equal to 50 percent of the interest payable on that underpayment under section 6601(a).

Section 6653(b)(1) requires the presence of two elements for a finding of civil tax fraud: underpayment of tax and fraudulent intent. Respondent bears the burden of proof on the issue of existence of fraud, sec. 7454(a); Rule 142(b), and can meet that burden by presenting a prima facie case of clear and convincing evidence. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. on other issues 959 F.2d 16 (2d Cir. 1992); Smith v. Commissioner, 91 T.C. 1049, 1053 n.3 (1988) (citing Rickard v. Commissioner, 15 B.T.A. 316, 317 (1929)), affd. 926 F.2d 1470 (6th Cir. 1991); see also Manton v. Commissioner, a Memorandum Opinion of this Court dated Nov. 22, 1948. The existence of fraud is a question of fact that we must resolve separately for each year upon considering the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Teitelbaum v. Commissioner, 294 F.2d 541, 547 (7th Cir. 1961), affg. T.C. Memo. 1960-11.

i. Existence of an underpayment

In addition to proving fraudulent intent, respondent bears the burden of proving, by clear and convincing evidence, that there is an underpayment. Sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, supra at 873. Section 6653(c)(1) defines an underpayment for the purposes of section 6653 as a deficiency as defined by section 6211. However, as in Franklin v. Commissioner, T.C. Memo. 1993-184, respondent presented little evidence at trial and little argument in her brief as to the existence and amounts of the underpayments.

Respondent did adduce considerable evidence that petitioner had large, unreported bank deposits in 1986 and 1987. For 1986, the parties also stipulated that petitioner received income from wages and interest, which also explained some of the deposits. Respondent further conceded that transfers and the $200,000 loan from Safra Bank explained still more of the bank deposits, because they were not includable in income. Petitioner's own corroborated explanations for the expenditure of much of the money that flowed through the three accounts in 1986 accounted for another portion of the bank deposits as nontaxable income. Only $99,077.39 of the bank deposits for 1986, along with stipulated sources of income and deductions, form clear and convincing evidence of taxable income of $109,656.47, upon which a deficiency may be calculated.

In 1987, the parties stipulated the unexplained bank deposits were $36,088. They also stipulated items of income and deductions such that petitioner's taxable income in 1987 upon which the deficiency is calculated is $30,082.

### ii. Fraudulent intent

The Code does not specifically define fraudulent intent. However, courts have developed a working definition of fraudulent intent as the "`actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing'". Estate of Temple v. Commissioner, 67 T.C. 143, 159 (1976) (quoting Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939)); see also Chin v. Commissioner, T.C. Memo. 1994-54.

Fraudulent intent may never be imputed or assumed, but must be proven by independent evidence. Recklitis v. Commissioner, supra at 909-910 (citing Beaver v. Commissioner, 55 T.C. 85, 92 (1970)); see also Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Stone v. Commissioner, 56 T.C. 213, 224 (1971). Because direct proof is often difficult to obtain, respondent may use circumstantial evidence. Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); see also Powell v. Granquist, 252 F.2d 56, 61 (9th Cir. 1958); Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).

(a) The badges of fraud

To that end, courts have, in the past, developed a non-exhaustive list of the "badges of fraud". Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990), affg. in part and revg. and remanding in part an Oral Opinion of this Court. Respondent's brief does little more than recite the badges without fully developing why their presence shows fraudulent intent for 1986 and 1987. In most cases, courts can infer a causal connection. But, the presence of contradictory evidence in this record makes these indicia insufficient by themselves to allow us to infer fraudulent intent. However, they still provide part of the foundation for that inference, and, hence, must be developed.

(i) Taxpayer's experience and sophistication

Petitioner's relative experience and sophistication are relevant in determining whether fraud exists. Stephenson v. Commissioner, 79 T.C. at 1006. While petitioner was not an astute businessman of the degree of sophistication described in Zand v. Commissioner, T.C. Memo. 1996-19, he nevertheless participated directly in the laundering of Ben's drug profits during a period that not only encompassed the 2 years in question, but went back as far as 1977, when he "invested" $80,000 in Sam Gilbert's enterprises on Ben's behalf, and 1983, when he participated in the initial discussions on how to invest in the card club.

(ii) Participation in illegal activities

The Court has repeatedly found that illegal activity strongly indicates the presence of fraud even when the taxpayer has not been criminally convicted. Clayton v. Commissioner, 102 T.C. 632, 647 (1994) (citing Bradford v. Commissioner, supra at 307-308) (ample evidence found of illegal activity based on taxpayer's engaging in illegal bookmaking, even though charges against him were dropped)); see also Meier v. Commissioner, 91 T.C. 273, 302-303 (1988); Deletis v Commissioner, T.C. Memo. 1995-512 (engaging in theft and concealment of that fact from his employer and failing to report the income derived is a course of conduct upon which the Court based its finding that the taxpayer acted fraudulently).

The evidence of illegal activity in this case is even more compelling than in Clayton because petitioner was convicted of money laundering. Petitioner funneled the proceeds from the card club investment into the Apache enterprises, some of it through his own bank accounts. He also tried to recover the $12 million investment in the card club. Petitioner admitted that his sources of income, at least in part, were those illegal activities for both 1986 and 1987. He produced no evidence to show that his sources of income for either year were anything other than criminal activity. SGA, controlled by Sam Gilbert, paid petitioner's "wages" in 1985 and 1986 as a conduit for returning laundered money to the Kramers.

(iii) Failure to maintain accurate records

A taxpayer's failure to maintain accurate records is another badge of fraud, especially in combination with other indicia. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Reaves v. Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C. 690 (1958); Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980).  The parties stipulated that petitioner failed to bring any books and records to the audit for 1986 and 1987.  This stipulation and respondent's use of the indirect bank deposits method to reconstruct income demonstrate that petitioner failed to maintain adequate records.  Even the incomplete nature of petitioner's explanations, especially in light of the other circumstantial evidence of the conduit nature of the three bank accounts, especially Safra, only accentuates the inadequacy of his records of income during 1986 and 1987.  Petitioner's failure to produce canceled checks that could begin to explain the $206,500 of expenditures in June 1986, payments displaying the hallmarks of the conduit theory that petitioner advances to explain the use of Safra to support Ben's enterprises, is the most eloquent testimony to the inadequacy of petitioner's records.

(iv) Unexplained bank deposits

While unexplained bank deposits are not themselves necessarily clear and convincing evidence of fraud,  York v. Commissioner, 24 T.C. 742, 743 (1955), a large discrepancy

between a taxpayer's actual income and his reported income is evidence of fraud. Stone v. Commissioner, 56 T.C. at 224. "This is particularly true where * * * there is other evidence that the taxpayer was engaged in unlawful activities which at once offer a probable explanation of the concealment, and make other violations of law, including tax fraud, less difficult to believe". Manton v. Commissioner, a Memorandum Opinion of this Court dated Nov. 22, 1948 (citing Rogers v. Commissioner, 111 F.2d 987 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938)); see also Recklitis v. Commissioner, 91 T.C. at 912. Even with the reduction in unexplained income that petitioner's explanations showed, large discrepancies still exist for which petitioner provided no evidence or explanation and for which we can find no answers, even given the corroborating circumstances of the conduit nature of Safra. This is especially true for 1986, specifically the June expenditures of $206,500. It is also true for 1987, where both respondent and petitioner stipulated $36,088 in unexplained bank deposits and analysis of the records shows that as much as $41,899.34 of deposits in the three accounts remained unexplained. When these discrepancies are viewed in the context of petitioner's admitted illegal activity, his demonstrated understanding of the consequences of his failure to report his income, and his failure to maintain adequate records, the unexplained bank deposits indicate fraudulent intent.

(v) Failure to file tax returns

Petitioner's failure to file tax returns in 1986 or 1987 serves as yet another indicator of fraud. Bradford v. Commissioner, 796 F.2d at 307-308. Petitioner's admitted understanding that he was obliged to file returns during those years reinforces the strength of this badge of fraud.

(vi) Failure to cooperate with tax authorities

Failure to cooperate with tax authorities is a badge of fraud. Zell v. Commissioner, 763 F.2d 1139, 1145-1146 (10th Cir. 1985) (taxpayer's open defiance of tax laws helped establish his intent to commit tax fraud), affg. T.C. Memo. 1984-152; Powell v. Granquist, 252 F.2d 56, 61 (9th Cir. 1958) (taxpayer's open defiance of tax laws helped establish his intent to commit tax fraud). By contrast, a taxpayer's active cooperation may be a factor in finding no fraud. Jones v. Commissioner, 259 F.2d 300, 303 (5th Cir. 1958) (taxpayer's cooperation by making his books readily available to authorities was one factor in finding no fraud), revg. and remanding 25 T.C. 1100 (1956); Chin v. Commissioner, T.C. Memo. 1994-54 (showing of cooperation by trying to correct past mistakes was one indication that there was no fraud). In this instance, petitioner deliberately failed to cooperate with the Government during the course of his audit for 1986 and 1987, albeit at his counsel's advice.

Reliance on an attorney or another tax preparer may constitute a defense against fraud if the taxpayer relied upon

the preparer's advice and actual preparation of the returns to calculate his taxable income. See, e.g., <u>Marinzulich v. Commissioner</u>, 31 T.C. 487, 490-491 (1958). However, not yet resolved is the tax consequence of whether a taxpayer can rely upon the advice of an attorney not to cooperate with the IRS because of the implications for ongoing criminal investigations against him. However, given the limited scope of the privilege against self-incrimination to protect a taxpayer from charges of failing to file a return, see, e.g., <u>United States v. Egan</u>, 459 F.2d 997, 998 (2d Cir. 1972), such a shield would not likely provide much comfort to petitioner. However, we need not reach that issue here, because the presence of all of the other factors prevents petitioner's failure to cooperate from being the sole determinant.

(b) <u>Causal connection between indicia of fraud and petitioner's specific purpose to evade paying taxes</u>

The record is replete with the badges of fraud as discussed above from which we can infer the specific purpose of evading taxes. But the record also contains some evidence that petitioner may not have actually intended to fraudulently evade paying taxes. The issue is whether, using the indicia of fraud in the presence of such contrary evidence, we infer from the record as a whole that petitioner had the specific purpose to evade paying his taxes. <u>Estate of Temple v. Commissioner</u>, 67 T.C. 143, 159 (1976).

In April 1987, when the 1986 return was due, petitioner was trying to recover the card club investment, and find a way out of the marina, activities that had occupied him for nearly a year following Murphy's arrest in Tortola.  In May of the previous year, Sam Gilbert had reneged on the payment of the "kicker" on the Troon Mortgage, and Fainsbert had openly said, at the May 1986, meeting at the Miami Marriott, that petitioner was no longer in charge of the marina.  By June 1987, petitioner had left the marina, either in a desperate attempt to continue to conceal Ben's interest in it, or because the Gilberts had forced him out.

In the wake of Ben's arrest in August 1987, petitioner and Maxine stayed in a condominium they had leased in Atlantic City during the late summer and fall of 1987 to "get away from it all".  Petitioner focused on recovering the $9.5 million from June 1987 until the meeting in Zurich in November 1987 effectively ended those efforts.  Thereafter, until his arrest in December 1989, petitioner was using laundered funds to make payments to lawyers and generally doing all that he could to keep his son from being convicted.  He also took care of his own legal fees of $250,000 with these same funds.[20]

---

[20]This $250,000 may have been additional income to petitioner in 1987 if he received the funds to pay his attorney in that year.  Although the record is somewhat ambiguous about the exact date that petitioner paid his attorney or received the funds to do so, petitioner did pay Ben's attorney in Nov. 1987.

(continued...)

Petitioner also feared criminal prosecution. Murphy had been arrested and the Troon Mortgage conduit disrupted. Petitioner was under investigation by a grand jury. Petitioner's fear of prosecution drove him in October 1986 to file a document that, as we have held, was not a tax return. Petitioner was afraid that a proper return could reveal his illegal sources of income and perhaps tie him to the money laundering. Max Forman, the accountant who had advised him and Ben on the card club investment, had signed the 1985 Form 1040 that petitioner and Maxine jointly filed. With Forman's advice and preparation, that Form 1040 completely lacked the requisite detail about income and deductions, even to the point of excluding the SGA "wages", the interest income, and bona fide deductions such as home mortgage interest. Fear of criminal investigation must have driven the decision to disclose no detail, because petitioner also inscribed a legend on the document that referred to the possible effect that the outcome of the grand jury investigation could have on his tax liability.

By 1987, petitioner's fear of criminal prosecution had grown even stronger. Ben's criminal enterprise was falling apart, and petitioner was trying to help him in the wake of his arrest by ensuring that his lawyers were paid. Petitioner also ensured

[20](...continued)
Even if respondent could establish receipt of the $250,000 in 1987, she has not asserted an increased deficiency pursuant to sec. 6214(a). Accordingly, we have not considered this in discussing the amount of the unreported income for 1987.

that his own criminal lawyer was paid.  But his understanding that filing a legitimate return and paying the tax shown thereon as due could reveal a link to criminal activity had not disappeared.  Petitioner has stipulated that he knew that he was required to file returns and pay taxes for 1986 and 1987.

Based upon the clear link between petitioner's fear of criminal prosecution, and his deliberate attempt to evade paying his taxes, we infer that petitioner had the requisite fraudulent intent.  The pressures that petitioner was under, and any sense that he was simply overwhelmed by events, do not rebut our conclusion, especially in light of the continuing nature of petitioner's fear of criminal prosecution.  The combination of the other indicia of fraud and petitioner's fear that filing adequate returns and paying taxes for 1986 and 1987 would increase his vulnerability to criminal prosecution is clear and convincing evidence of fraudulent intent to evade paying taxes.

### iii. Portion of underpayment attributable to fraud

Once the underpayment is established, respondent need only establish that some portion stems from fraud, sec. 6653(b)(2); Otsuki v. Commissioner, 53 T.C. 96, 105 (1969); Meier v. Commissioner, 91 T.C. at 303, thereby shifting to petitioner the burden of showing, by a preponderance of the evidence, the part of the underpayment that does not stem from fraud.  The clear and convincing evidence in the record links the fraud to at least part of each year's underpayment.  Petitioner stipulated that he

received income from illegal sources in both years. He sought to conceal that income and its sources by not filing tax returns and paying taxes for 1986 and 1987. Petitioner presented no evidence that any portion of the income, and thus of the underpayment in either year, was not due to fraud. Petitioner is therefore liable for additions to tax for fraud on the entire underpayments for both years. Sec. 6653(b)(2).

b. Substantial underpayment of tax--section 6661

For 1986 and 1987, section 6661 authorizes an addition to tax of 25 percent of any underpayment if there has been a substantial understatement of income. Pallottini v. Commissioner, 90 T.C. 498 (1988) (the applicable rate for assessments made after October 21, 1986, is 25 percent). The Code defines a substantial understatement as one that exceeds 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1)(A); Tweeddale v. Commissioner, 92 T.C. 501, 505 (1989); Woods v. Commissioner, 91 T.C. 88, 95 (1988). An understatement is the difference between the tax required to be shown on the return and the actual amount shown. Since petitioner failed to file returns for both years, the understatement for both years is the entire deficiency. Estate of McClanahan v. Commissioner, 95 T.C. 98, 103 (1990) (section 6661 applies both to taxpayers who fail to disclose adequately their taxable income and tax due on a return and to taxpayers who fail to file any return at all). The understatements from both

years are substantial because they are necessarily greater than 10 percent, and they both exceed $5,000. Woods v. Commissioner, supra at 95. As discussed supra under Issue 1 of this opinion, we have recalculated the understatements based upon the evidence presented by petitioner rebutting respondent's initially determined deficiency determinations.

The underpayment against which the statute calculates the 25 percent addition is the understatement net of any prepayment credits, which in this situation is the withholding paid in each of the two years. Id. at 99. The amount of the underpayment may be further reduced by the portion attributable to the tax treatment of any item if there was substantial authority for such treatment (a reduction for items that were adequately disclosed on the return or in a statement attached to the return is not applicable because no returns were filed). Sec. 6661(b)(2)(B). Petitioner has failed to present any evidence or argument for a reduction under section 6661. We therefore hold him liable for the additions to tax for substantial understatement for both years on the full amounts of the understatements. See Bard v. Commissioner, T.C. Memo. 1993-105.

### c. Failure to pay estimated tax--section 6654

Respondent determined an addition to tax under section 6654(a) for petitioner's failure to pay estimated income tax.

The addition is imposed at the rate determined by section 6621.[21] Imposition of the tax is mandatory where prepayments of the tax, either through withholding or by making estimated quarterly payments, do not satisfy the specified percentages of total liability required under the statute. Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980); see also Swonder v. Commissioner, T.C. Memo. 1994-430. Section 6654 allows no generally available reasonable cause or willful neglect defenses. See Swonder v. Commissioner, supra; cf. sec. 6654(e)(3)(B) (reasonable cause/willful neglect defense allowed for newly retired or disabled individuals).

Once respondent determines that petitioner is liable for the addition to tax under section 6654, the burden shifts to petitioner to prove, by a preponderance of the evidence, that respondent's determination was incorrect. Rule 142(a); Register v. Commissioner, T.C. Memo. 1988-390.

Petitioner presented no evidence on this issue. He did not pay any estimated income tax in either 1986 or 1987 beyond minimal withholding on the wages reported by Sam Gilbert Associates in 1986 and Fort Apache, Inc. in 1987.[22] Therefore, petitioner is liable for the addition to tax imposed by section 6654(a) for both years.

---

[21]The rate is the short-term Federal rate for the applicable period plus 3 percentage points. Sec. 6621(a)(2) and (b).

[22]See infra Tables 9 and 14 in appendix.

To reflect the foregoing,

An appropriate order will be issued denying petitioners' oral motion to dismiss in the case at docket No. 22457-91.

Decisions will be entered under Rule 155.

Safra Bank--1985

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| January | - 0 - | - 0 - | - 0 - | |
| February | - 0 - | - 0 - | - 0 - | |
| March | - 0 - | - 0 - | - 0 - | |
| April | - 0 - | - 0 - | - 0 - | |
| May | - 0 - | - 0 - | - 0 - | |
| June | - 0 - | - 0 - | - 0 - | |
| July | - 0 - | - 0 - | - 0 - | |
| August | - 0 - | - 0 - | - 0 - | |
| September | - 0 - | - 0 - | - 0 - | |
| October | - 0 - | - 0 - | - 0 - | |
| November | - 0 - | - 0 - | - 0 - | |
| December | $85,000 | $50,000 | $50,000 | 1. Deposit came from Len-Ed, of which Dublin was an owner.<br>2. $35,000 "loan" to Apache Power Boats and $15,000 to Team Apache "to pay expenses". |
| Total for year | 85,000 | 50,000 | 50,000 | |
| Adjustments | 50,000 | 50,000 | | |
| Net total | 35,000 | - 0 - | | |

Table 2

Barnett Money Market Account--1985

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| January | $18,860.35 | $11,176.89 | - 0 - | |
| February | 6,229.83 | 20,923.98 | 7,845.00 | 1. $4,000 to Miami Boat Show for Apache Powerboat. 2. $3,845 for Marina insurance (Fort Apache). |
| March | 1,824.19 | 4,731.08 | - 0 - | |
| April | 3,227.26 | 5,203.15 | - 0 - | |
| May | 4,012.70 | 9,733.40 | 2,733.40 | 1. $2,733.40 to sponsor of boat race. |
| June | 4,681.10 | 500.00 | - 0 - | |
| July | 21,179.70 | 2,930.22 | - 0 - | |
| August | 1,012.70 | 3,443.69 | - 0 - | |
| September | 2,352.34 | 6,294.90 | - 0 - | |
| October | - 0 - | 2,873.00 | - 0 - | |
| November | 18,454.81 | 2,273.00 | - 0 - | 1. $17,518.84 is from an inheritance conceded by respondent in the notice of deficiency for tax year 1985. This amount is not included in adjustments, but deducted from income as nontaxable income in Table 5. |
| December | 19,249.67 | 19,387.40 | 18,887.40 | 1. $18,887.40 for furniture for Fort Apache/Team Apache. 2. $2,122.49 is traced to an inheritance conceded by respondent in the notice of deficiency. This amount is not included in the adjustments, but deducted from income as nontaxable income in Table 5. |
| Total for year | 101,084.65 | 89,470.71 | 29,465.80 | |

Adjustments    29,465.80     29,465.80

  Net total    71,618.85     60,004.91      - 0 -

Table 3

Barnett Joint Checking--1985

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| January | $3,208.61 | $2,832.71 | - 0 - | |
| February | 1,198.61 | 1,536.69 | - 0 - | |
| March | 3,767.12 | 5,017.69 | - 0 - | |
| April | 5,529.70 | 3,546.56 | - 0 - | |
| May | 3,592.03 | 4,620.54 | - 0 - | |
| June | 4,322.44 | 4,868.57 | - 0 - | |
| July | 2,185.03 | 2,286.76 | - 0 - | |
| August | 2,830.09 | 1,779.65 | - 0 - | |
| September | 2,313.98 | 3,628.08 | - 0 - | |
| October | 2,848.30 | 2,236.89 | - 0 - | |
| November | 2,559.63 | 1,409.10 | - 0 - | |
| December | 4,186.36 | 4,695.21 | - 0 - | |
| Total for year | 38,541.90 | 38,458.45 | - 0 - | |
| Adjustments | - 0 - | - 0 - | | |
| Net total | 38,541.90 | 38,458.45 | | |

Table 4

Schedule C Reconstruction--1985

| Bank Deposits | Amount | | Explanation |
|---|---|---|---|
| Barnett joint checking | $38,541.90 | | |
| Barnett money market | 101,084.65 | | |
| Safra Bank | 85,000.00 | | |
| | | 224,626.55 | |
| Nontaxable Income | | | |
| Refunds/Reimbursements | 2,753.00 | | 1. These figures drawn from notice of deficiency for tax year 1985. |
| Certificate of deposit | 15,191.00 | | |
| Transfers | 3,000.00 | | |
| Exchanges | 1,250.00 | | |
| Sale of house | 20,000.00 | | |
| Inheritance | 19,641.00 | | 2. Inheritance deposited into the Barnett money market account in November and December 1985. |
| Sale of car | 14,000.00 | | |
| | | (75,835.00) | |
| Petitioner's Explanations | | | |
| Safra Bank | 50,000.00 | | 1. Table 1. |
| Barnett money market | 29,465.80 | | 2. Table 2 |
| Barnett joint checking | - 0 - | | 3. Table 3 |
| | | (79,465.80) | |
| Unexplained Bank Deposits (Without taking into account stipulated sources of income) | | 69,325.75 | |
| Wages | 32,199.00 | | |
| Less withholding | (5,329.00) | | |
| Less FICA | (2,270.00) | | |
| Net Wages | | (24,600.00) | |
| Other Sources of Income | | | |

```
Interest income                    11,777.00
State tax refund                    3,468.00
                                              (15,245.00)

   Net unexplained deposits                    29,480.75
```

Table 5

Income Calculation--1985

| | Amount | | Explanation |
|---|---|---|---|
| | Amount | | Explanation |
| Wages | $32,199.00 | | |
| Interest | 11,777.00 | | |
| State income tax refund | 3,468.00 | | |
| Unexplained bank deposits | 29,480.75 | | 1. From Table 4. |
| Total income | | 76,924.75 | |
| Stipulated deductions | (28,044.00) | | 2. All deductions listed herein either stipulated by the parties or drawn from the notice of deficiency for tax year 1985. |
| Contributions | 2,733.00 | | |
| Sales tax | 747.00 | | |
| Real property taxes | 3,483.00 | | |
| Mortgage interest | 21,501.00 | | |
| Zero Bracket Amount | (3,540.00) | | 3. Reduction in allowable itemized deductions as calculated in the notice of deficiency for tax year 1985. |
| Personal exemptions | 3,120.00 | | 4. Three personal exemptions allowed in the notice of deficiency. |
| | | (28,044.00) | |
| Taxable Income | | 48,880.75 | |

Table 6

Safra Bank--1986

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| January | $30,768.33 | $26,013.29 | $19,123.29 | 1. $370.89 for freight delivery to Team Apache.<br>2. $2,355.80 insurance for the racing enterprises.<br>3. $1,396.60 for engine blocks.<br>4. $5,000 "loan" to Apache Boats, Inc.<br>5. $10,000 to pay for Fort Apache insurance. |
| February | - 0 - | 37,208.44 | 35,025.44 | 1. $3,229 to pay balance on insurance installment.<br>2. $8,557.50 to pay for Fort Apache advertising.<br>3. $10,000 to pay next installment for insurance.<br>4. $9,000 to Emerson Allsworth Trust for legal services rendered.<br>5. $4,238.94 to Allsworth personally--exact reason unknown--probably to pay for land for the marina. Ben used Allsworth's Trust Account as a conduit for purchase of that land. |
| March | - 0 - | 126.00 | - 0 - | |
| April | 505,000.00 | 155,000.00 | 155,000.00 | 1. $5,000 for offshore boat race purse for race that Ben sponsored.<br>2. $100,000 payment for forklifts used at Fort Apache<br>3. $50,000 to Ben's racing team. |
| May | - 0 - | 240,914.18 | 217,434.00 | 1. $100,000 payment to Len-Ed Construction. This was one of the destinations for the $505,000 that Sam Gilbert, using LCP Associates, which was run by Dale Lyon and David Pierson, had deposited in the account that month, although the funds originated from Ben.<br>2. $5,000 for insurance costs.<br>3. $6,384 to Allsworth Trust Account for property purchased by Allsworth for Ben.<br>4. $3,500 to Allsworth Trust; legal services rendered.<br>5. $2,700 to repay a personal loan from Dublin, one of the owners of Len-Ed Construction, a beneficiary of funds from this account.<br>6. $9,980 to buy a boat.<br>7. $43,000 to pay rigger for Ben's race boats. |

8. $5,370 for three airline tickets to Hong Kong so that petitioner could open new accounts for money laundering.
9. $12,500 for work on the boat just purchased.
10. $24,000 for legal services to Melvin Kessler (Kessler was involved in the laundering of $12 million in an operation involving banks in Lichtenstein).
11. $5,000 for insurance.

June          - 0 -       206,500.00      - 0 -

Table 6 (Continued)

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| July | 165,000.00 | 71,814.17 | 69,435.00 | 1. $6,500 to Allsworth Trust for legal services. 2. $2,500 to Allsworth Trust for legal services. 3. $6,403 for insurance for the offshore boat race. 4. $2,090 to American Power Boat Assn. for an entry fee for race. 5. $28,742 for race expenses for the race that Ben was sponsoring. 6. $10,000 for electronics installed on one of Ben's Boats, the Apache Queen. 7. $10,000 to Apache Boats, Inc. 8. $3,200 (five checks) to IRS for taxes owed by Superchief, Apache Boats, Inc., Apache Offshore Engineering, Apache Racing Team, Inc., and Fort Apache, Inc. 9. The deposits for this month are labeled in the bank deposit slip as having come from proceeds of Loan # 730-000-4195. |
| August | 35,000.00 | 46,742.19 | 43,226.22 | 1. $2,500 in two payments (to Nova University and Joe Sonken) for the building housing Apache Boats, Inc. 2. $11,726.22 for a helicopter lease for the offshore boat race. 3. $4,000 to furnish the interior of Apache Queen. 4. $10,000 to the local offshore boat racing association for a boat race. 5. $5,000 to Kate Bonner for legal services for Ben's enterprises (She was a criminal defense attorney who was later associated with Ben Kramer's criminal trial as one of his counsel). 6. $10,000 to pay an invoice for Apache racing. 7. The deposits for this month are listed on the deposit Memos as having come from the proceeds of loan # 730-000-4195. |
| September | 75,000.00 | 38,019.53 | 36,646.75 | 1. $6,000 to Allsworth Trust Account for either legal services or property purchased on account for Ben. 2. $1,985 for pilot services for helicopter. |

3. $20,000 to an employee of Team Apache (which entity is unclear), given at Ben's behest, to buy out his retirement fund from another employer.

4. $543.90 for paperhanger for Marina.

5. $2,000 for the Apache Queen.

6. $4,000 to Allsworth Trust Account for legal services.

7. $2,117.85 for office furniture for the Marina.

8. The deposit is listed as a transfer from account number 939-0614467 "per letter in file" [signed] Jack Kramer.

Table 6 (Continued)

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| October | 38,359.87 | 43,311.93 | 34,540.00 | 1. $20,000 for insurance for Fort Apache. 2. $2,500 for rent on building Apache Power Boats. 3. $3,200 for pictures of the offshore boat race. 4. $8,840 for cabinetry of the Marina Office. 5. A deposit slip for $12,000 lists that deposit as having come from account # 0614270 - not the same account number as the previous month. |
| November | - 0 - | 20,220.50 | 10,720.50 | 1. $7,505.50 to Allsworth Trust Account for either legal services or property purchased on account for Ben. 2. $1,000 to the offshore boat association. 3. $1,215 to an air service for trip in conjunction with a boat race. 4. $1,000 to Allsworth Trust Account for services of some kind. |
| December | - 0 - | - 0 - | - 0 - | |
| Total for year | 849,128.20 | 885,870.23 | 621,151.20 | 1. The total amount of all the deposits listed exceeds by $75,200 the amount listed in Schedule C of the notice of deficiency for tax years 1986 and 1987. |
| Adjustments | 621,151.20 | 621,151.20 | | |
| Net total | 227,977.00 | 264,719.03 | | |

Table 7

Barnett Money Market Account--1986

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| January | $5,000.00 | $3,980.98 | - 0 - | |
| February | 968.87 | 1,109.40 | - 0 - | |
| March | - 0 - | 11,045.95 | 5,087.50 | 1. $5,087.50 paid balance for decorating services for Team Apache. |
| April | 1,887.74 | 2,698.00 | - 0 - | |
| May | 2,449.94 | 11,193.67 | - 0 - | |
| June | 1,887.74 | 1,876.00 | - 0 - | |
| July | 30,204.45 | 6,198.00 | 32,204.45 | 1. $30,204.45 is a Federal tax refund and nontaxable. 2. $2,000 paid for accounting services to the enterprise. |
| August | - 0 - | 17,766.35 | 5,120.00 | 1. $3,620 for interior decoration of Ben's office. 2. $1,500 for office furniture for one of the Apache enterprises. |
| September | - 0 - | 4,531.39 | 2,023.39 | 1. $2,023.39 for interior decoration of Ben's office. |
| October | 2,263.50 | 17,000.00 | - 0 - | |
| November | 100,900.00 | 44,328.58 | - 0 - | 1. There was single large deposit of unexplained origin. On the same day as the deposit, there was an outgoing funds transfer of $25,550. A check was written on the account the next day for $15,000. Petitioner offered no explanation. In 1987, however, there were more funds with an explanation from petitioner that were outgoing than were deposited. This partially explains the use of this large deposit. |
| December | - 0 - | 11,795.00 | - 0 - | |

| | | | |
|---|---|---|---|
| Total | 145,562.24 | 133,523.32 | 44,435.34 |

1. The total amount of bank deposits is greater than that listed in Schedule C of the notice of deficiency for tax years 1986 and 1987 by $2,263.50.

| | | |
|---|---|---|
| Adjustments | 44,435.34 | 44,435.34 |

| | | |
|---|---|---|
| Net total | 101,126.90 | 89,087.98 |

Table 8

Barnett Joint Checking--1986

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| January | $4,473.38 | $1,790.79 | - 0 - | |
| February | - 0 - | 3,122.21 | - 0 - | |
| March | 1,953.57 | 2,230.17 | - 0 - | |
| April | 2,131.87 | 1,341.79 | - 0 - | |
| May | 3,507.00 | 1,310.24 | - 0 - | |
| June | 2,403.94 | 4,398.60 | - 0 - | |
| July | 3,177.88 | 3,068.53 | - 0 - | |
| August | 4,830.54 | 4,386.61 | - 0 - | |
| September | 1,611.62 | 2,567.52 | - 0 - | |
| October | 1,881.62 | 2,849.85 | - 0 - | |
| November | 22,500.00 | 7,395.13 | - 0 - | |
| December | - 0 - | 12,920.34 | - 0 - | |
| Total for year | 48,471.42 | 47,381.78 | - 0 - | |
| Adjustments | - 0 - | - 0 - | | |
| Net total | 48,471.42 | 47,381.78 | | 1. Note that amount of bank deposits is $9,050 less than Schedule C, contained in the notice of deficiency for tax years 1986 and 1987.  The difference cannot be explained by counting the beginning balance ($1,564.62). |

Table 9

Schedule C Reconstruction--1986

| Bank Deposits | Amount | | Explanation |
|---|---|---|---|
| Barnett joint checking | $48,471.42 | | |
| Barnett money market | 145,562.24 | | |
| Safra Bank | 849,128.20 | | |
| | | 1,043,161.86 | |

| Nontaxable Income | | | |
|---|---|---|---|
| Transfers | 37,300.00 | | 1. These figures drawn from the notice of deficiency for tax years 1986 and 1987. 2. The notice of deficiency lists only $37,300 from transfers this year.  The Safra account lists $62,000 in transfers from two different bank accounts.  The other two accounts do not list any transfers. |
| Loans - Safra Bank | 200,000.00 | | 3. Respondent conceded the nontaxable source of funds on its original Schedule C calculations in the notice of deficiency. These loans probably account for July and August deposits. |
| Tax Refund | 30,204.45 | | |
| | | (267,504.45) | |

| Petitioner's Explanations | | | |
|---|---|---|---|
| Safra Bank | 621,151.20 | | 1. Table 6. |
| Barnett money market 1986  expenditures | 14,230.89 | | 2. Table 7.  This amount is less the $30,204.45 tax refund conceded by respondent and accounted for in "Nontaxable Income". |
| Barnett money market 1987 expenditures | 8,475.93 | | 3. This reflects expenditures made in 1987 whose source was 1966 deposits.  See Table 12. |

(643,858.02)


Unexplained Bank Deposits                   131,799.39
(Without taking into
 account stipulated
 sources of income)

Table 9 (Continued)

Stipulated Sources of Income

| | | |
|---|---|---|
| Wages | 34,020.00 | |
| Less withholding | (6,788.00) | |
| Less FICA | (2,432.00) | |
| | | |
| Net Wages | | (24,800.00) |

Other Sources of Income

| | | |
|---|---|---|
| Interest income | 7,922.00 | (7,922.00) |
| | | |
| Net unexplained deposits | | 99,077.39 |

Table 10

Income Calculation--1986

| | Amount | | Explanation |
|---|---|---|---|
| Wages | $34,020.00 | | |
| Interest | 7,922.00 | | |
| Unexplained bank deposits | 99,077.39 | | 1. From Table 9. |
| Total income | | 141,019.39 | |
| Stipulated deductions | (31,362.92) | | 1. All deductions listed herein were either stipulated by the parties or drawn from the notice of deficiency for tax years 1986 and 1987. |
| Real property taxes | 3,104.00 | | |
| Mortgage interest | 21,366.00 | | |
| Personal interest deduction | 4,732.92 | | |
| Personal Exemptions | 2,160.00 | | 2. Two exemptions. |
| | | (31,362.92) | |
| Taxable Income | | 109,656.47 | |

Table 11

Safra Bank--1987

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| January | $400 | - 0 - | - 0 - | 1. This deposit was made to correct a $372 overdraft that had existed since November. |
| February | - 0 - | - 0 - | - 0 - | |
| March | - 0 - | - 0 - | - 0 - | |
| April | - 0 - | - 0 - | - 0 - | |
| May | - 0 - | - 0 - | - 0 - | |
| June | - 0 - | - 0 - | - 0 - | |
| July | - 0 - | - 0 - | - 0 - | 2. Account closed in July. |
| August | - 0 - | - 0 - | - 0 - | |
| September | - 0 - | - 0 - | - 0 - | |
| October | - 0 - | - 0 - | - 0 - | |
| November | - 0 - | - 0 - | - 0 - | |
| December | - 0 - | - 0 - | - 0 - | |
| Total for year | 400 | - 0 - | | |
| Adjustments | - 0 - | - 0 - | | |
| Net total | 400 | | | |

Table 12

Barnett Money Market  Account--1987

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| January | - 0 - | $17,183.19 | - 0 - | |
| February | - 0 - | 13,943.25 | $2,500.00 | 1. $2,500 for Apache Power Boats building rental. |
| March | $1,495.00 | 9,990.00 | 3,200.00 | 1. $3,200 to Allsworth Trust Account for legal services rendered. |
| April | 2,680.00 | 7,393.81 | 6,950.93 | 1. $4,850.93 for taxes on Ben's house at Hibiscus. 2. $2,100 to Allsworth Trust Account for legal services rendered. |
| May | - 0 - | 994.00 | - 0 - | |
| June | - 0 - | - 0 - | - 0 - | |
| July | - 0 - | - 0 - | - 0 - | |
| August | - 0 - | - 0 - | - 0 - | |
| September | - 0 - | - 0 - | - 0 - | |
| October | - 0 - | 730.80 | - 0 - | |
| November | - 0 - | - 0 - | - 0 - | |
| December | - 0 - | - 0 - | - 0 - | |
| Total for year | 4,175.00 | 50,235.05 | 12,650.93 | 1. The source of funds for these checks for which petitioner makes explanations comes from the previous year's deposits, which were largely the remains of the November 1985 $100,900 deposit. |
| Adjustments | 12,650.93 | 12,650.93 | | |
| Net total | (8,475.93) | 37,584.12 | | |

Table 13

Barnett Joint Checking--1987

| Month | Deposit/ Credit | Check/ Debit | Adjustment | Explanation |
|---|---|---|---|---|
| January | $11,290.50 | $8,929.50 | - 0 - | |
| February | 4,245.40 | 5,403.47 | - 0 - | |
| March | 2,131.92 | 3,966.59 | - 0 - | |
| April | 4,342.50 | 3,109.65 | - 0 - | |
| May | 1,047.50 | 4,067.93 | - 0 - | |
| June | 10,745.44 | 4,045.92 | - 0 - | |
| July | 8,154.44 | 9,450.52 | - 0 - | |
| August | - 0 - | 2,817.45 | - 0 - | |
| September | - 0 - | 945.85 | - 0 - | |
| October | 3,439.00 | 4,515.70 | - 0 - | |
| November | 4,269.70 | 3,363.18 | - 0 - | |
| December | 154,928.94 | 155,151.45 | $150,000.00 | 1. This is the $150,000 loan from petitioner's sister-in-law conceded by respondent. The monthly statement reports a $150,000 check written on the same day as a $150,000 deposit. |
| Total for year | 204,595.34 | 205,767.21 | 150,000.00 | 2. This is exactly $10,000 more than respondent reported in Schedule C income in the notice of deficiency for tax years 1986 and 1987 as coming from this account. |
| Adjustments | 150,000.00 | 150,000.00 | | |
| Net total | 54,595.34 | 55,767.21 | | |

Table 14

Schedule C Reconstruction--1987

| Bank Deposits | Amount | | Explanation |
|---|---|---|---|
| Barnett joint checking | $204,595.34 | | Table 13. |
| Barnett money market | 4,175.00 | | Table 12. |
| Safra Bank | 400.00 | | Table 11. |
| | | 209,170.34 | |

| Petitioner's Explanations | | | |
|---|---|---|---|
| Safra Bank | - 0 - | | 1. Table 11. |
| Barnett money market | 4,175.00 | | 2. To account for the balance carried forward from 1986, $8,475.93 allocated to 1986 (the amount that exceeds 1987 deposits). The rest is allocated to 1987. |
| Barnett joint checking | 150,000.00 | | 3. Table 13. |
| | | (154,175.00) | |

| Unexplained Bank Deposits (Without taking into account stipulated sources of income) | | 54,995.34 | |
|---|---|---|---|
| Wages | 17,000.00 | | |
| Less withholding | (3,077.00) | | |
| Less FICA | (1,215.00) | | |
| Net Wages | | (12,708.00) | |

| Other Sources of Income | | | |
|---|---|---|---|
| Interest income | 388.00 | (388.00) | |
| Net unexplained deposits | | 41,899.34 | 1. Respondent and petitioner stipulated that the unexplained bank deposits for 1987 were $36,088. The record supports |

$41,899.34 of unexplained deposits.  The $8,450 properly allocated to 1986 does not explain the difference.  We calculate petitioner's 1987 income using the smaller amount stipulated by the parties.

Table 15

Income Calculation--1987

| | Amount | | Explanation |
|---|---|---|---|
| Wages | $17.000.00 | | |
| Interest | 388.00 | | |
| Unexplained bank deposits | 36,088.00 | | 1. Amount stipulated by the parties (see explanation in Table 14). |
| Total income | | 53,476.00 | |
| Stipulated deductions | (23,394.00) | | 1. The deductions listed herein were either stipulated or drawn from the notice of deficiency for tax years 1986 and 1987. |
| Real property taxes | 6,594.00 | | |
| Mortgage interest | 13,000.00 | | |
| Personal exemptions | 3,800.00 | | 2. Two exemptions. |
| | | (23,394.00) | |
| Taxable Income | | 30,082.00 | |